1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

**IN THE MATTER OF:**

**G.P.**, an individual,

Plaintiff,

v.

**JOSE HERNANDEZ AREVALO**, an

individual;

**MARICELA JIMENEZ**, an individual;

**TURO, INC.**, a Delaware Corporation;

**META PLATFORMS, INC.**, a Delaware

Corporation;

**REDDIT, INC.**, a Delaware Corporation;

**YOUTUBE, LLC**, a Delaware Limited

Liability Company;

**ATLANTA BLACK STAR, INC.**, a Georgia

Corporation;

**INSIDE EDITION, INC.**, a New York

Corporation; and

**JOHN DOES 1-10**, individuals or entities

unknown,

Defendants.

Case No.: XXX-XXX

**COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF**
*(Federal Wiretap Act Violations;
Washington Privacy Act Violations;
Intrusion Upon Seclusion; Public
Disclosure of Private Facts;
Misappropriation of Likeness;
Defamation and False Light;
Intentional Infliction of Emotional
Distress; Negligence; Vicarious
Liability; Negligent Entrustment; and
Request for Injunctive Relief Against
Platforms and Media Defendants)*

Plaintiff G.P., by and through her undersigned counsel, brings this Complaint against the above-named Defendants and alleges as follows:

## I. INTRODUCTION

1. This is a case about the systematic violation of a woman's most fundamental right—the right to privacy—and the devastating cascade of consequences that followed when that violation was weaponized for revenge and amplified by internet platforms and media outlets to millions of people worldwide.

2. In August 2025, G.P., a 37-year-old private citizen, single mother of two children, and healthcare professional, rented a vehicle through Turo's car-sharing service. Without her knowledge or consent, the vehicle's host, Defendant Jose Hernandez Arevalo, had installed a hidden interior dashcam that recorded not only video of the road ahead but also audio and video of the vehicle's interior—capturing Ms. G.P.'s private conversations, her voice, and her vulnerable moments inside what she reasonably believed was a private space.

3. When Ms. G.P. was involved in a single-vehicle accident that afternoon, she became the unwitting subject of what would become a global violation of her privacy, her dignity, and her right to control her own image and identity. Defendant Arevalo, acting with calculated malice and motivated by personal revenge, extracted the illegally obtained dashcam footage, edited it to be maximally humiliating, and published it to social media with inflammatory captions designed to publicly shame and "blast" Ms. G.P.

4. What followed was a cataclysm: The video spread virally across Facebook, Instagram, Reddit, TikTok, and other platforms. It was picked up by mainstream media outlets including Inside Edition and Atlanta Black Star. Millions of strangers worldwide saw Ms. G.P.'s face, heard her panicked voice, learned her identity, and were presented with a false and damaging narrative that she had lied and was reckless.

5. The consequences for Ms. G.P. have been profound and ongoing: severe emotional trauma, professional damage, public humiliation, social isolation, loss of her fundamental

sense of safety and privacy, and the permanent commodification of her image and personal moment of vulnerability.

6. All of this was accomplished through conduct that violated federal law (the Federal Wiretap Act, 18 U.S.C. § 2511), Washington state law (RCW 9.73.030, the Washington Privacy Act), and the common law of privacy and tort.

7. This lawsuit seeks to hold Defendants accountable for these violations, to recover compensatory and statutory damages, to obtain injunctive relief requiring removal of Ms. G.P.'s identifying information and image from internet platforms, and to send a clear message: in this country, a private person's right to privacy, dignity, and freedom from malicious harassment cannot be violated with impunity.

8. Plaintiff proceeds under the pseudonym "G.P." pursuant to a contemporaneously filed Motion for Leave to Proceed Under Pseudonym. Plaintiff's true legal name has been filed under seal and will be disclosed to all Defendants under the terms of a protective order.

## II. JURISDICTION AND VENUE

### A. Subject Matter Jurisdiction

1. This Court has subject matter jurisdiction over this action pursuant to multiple bases:

a. **28 U.S.C. § 1332 (Diversity of Citizenship):** Plaintiff G.P. is a citizen of the State of Washington. Defendant Turo, Inc. is a citizen of the State of Delaware (where it is incorporated) and the State of California (where it maintains its principal place of business). The amount in controversy, exclusive of interest and costs, exceeds $75,000. Therefore, there is complete diversity between Plaintiff and Defendant Turo, conferring subject matter jurisdiction on this Court under the diversity statute.

b. **28 U.S.C. § 1331 (Federal Question):** This action arises under the laws of the United States, specifically 18 U.S.C. § 2511 et seq. (the Federal Wiretap Act). Plaintiff asserts claims for violations of the Federal Wiretap Act against Defendant Arevalo. A substantial part of the plaintiff's claims arises under federal law, conferring federal question jurisdiction on this Court.

c. **28 U.S.C. § 1367 (Supplemental Jurisdiction):** To the extent that claims against Defendants Jose Hernandez Arevalo, Maricela Jimenez, and the other Defendants are not independently supported by diversity or federal question jurisdiction, this Court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a). All claims asserted herein arise from a common nucleus of operative fact—the illegal recording of Plaintiff without consent on August 25, 2025, and the subsequent unauthorized publication and dissemination of that recording—and are such that a plaintiff would ordinarily be expected to try them in a single judicial proceeding. Supplemental jurisdiction is appropriate and should not be declined under 28 U.S.C. § 1367(c).

**B. Personal Jurisdiction**

1. **Defendant Jose Hernandez Arevalo:** Defendant Arevalo is a resident of Snohomish County, Washington. He committed the tortious acts alleged herein—the unlawful recording of Plaintiff without her consent and the intentional publication of that recording to social media—within the State of Washington, specifically in Snohomish County. His actions were knowingly directed at and caused injury to Plaintiff, a Washington resident, within this state. Therefore, Arevalo is subject to personal jurisdiction in this Court. See Fed. R. Civ. P. 4(k)(1)(A).

2. **Defendant Maricela Jimenez:** Defendant Jimenez is the registered owner of the vehicle involved in the rental transaction at issue. She is believed to be a resident of Washington State. To the extent she acted as a co-host or approved Arevalo's management of the rental, she committed or authorized tortious acts (or breached duties) in Washington. The claims against her arise directly from conduct occurring in Washington. Therefore, she is subject to personal jurisdiction in this Court.

3. **Defendant Turo, Inc.:** Defendant Turo, Inc. has purposefully availed itself of the Washington market by conducting extensive business operations within this state. Turo facilitates thousands of vehicle rentals throughout Washington, advertises its services to Washington residents, collects fees from all Washington transactions, and exercises significant control over the terms and conditions governing those transactions. The rental transaction at issue in this case occurred entirely in Washington. The claims against Turo

1    arise directly from its business activities in Washington. Therefore, Turo is subject to

2    personal jurisdiction in this Court. See *Calder v. Jones*, 465 U.S. 783 (1984); *World-Wide*

3    *Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980).

4.   **Defendant Meta Platforms, Inc.:** Meta Platforms, Inc. (owner of Facebook and

     Instagram) conducts continuous and systematic business within Washington State. Meta

     maintains millions of users in Washington, operates offices and data facilities in the

     Pacific Northwest, conducts targeted advertising within Washington, and derives

     substantial revenue from Washington-based users and advertisers. Meta's platforms were

     the initial vector for publication of the illegal content at issue, and Meta algorithmically

     amplified the content knowing it involved a Washington incident and Washington

     resident. The claims against Meta arise from its conduct directed at Plaintiff in

     Washington and its knowing hosting and amplification of unlawfully obtained content.

     Therefore, Meta is subject to personal jurisdiction in this Court.

5.   **Defendant Reddit, Inc.:** Defendant Reddit, Inc. conducts substantial business within

     Washington State through its platform, which is accessible to and actively used by

     millions of Washington residents. Reddit's users in this state posted the video and

     engaged in harassment of Plaintiff. Reddit's algorithms directed and amplified content

     related to the incident. The claims against Reddit arise from its conduct within

     Washington and its role in hosting and amplifying unlawfully obtained content.

     Therefore, Reddit is subject to personal jurisdiction in this Court.

6.   **Defendant YouTube, LLC:** YouTube, LLC is owned by Alphabet Inc. and conducts

     substantial and continuous business within Washington State. The video was posted and

     republished on YouTube multiple times. YouTube's algorithms recommend and amplify

     this content. The claims against YouTube arise from its business activities in Washington

     and its role in hosting and amplifying the unlawful content. YouTube is subject to

     personal jurisdiction in this Court.

7.   **Defendants Atlanta Black Star, Inc. and Inside Edition, Inc.:** Both defendants publish

     content on the internet that is accessible worldwide, including within Washington. Both

defendants specifically published content about the incident involving Plaintiff, a Washington resident, knowing it would be accessed in Washington. Both defendants' articles and videos caused injury to Plaintiff in Washington. Both defendants engaged in commerce reaching Washington and can reasonably foresee being sued in Washington for content concerning Washington events and residents. Therefore, both are subject to personal jurisdiction in this Court.

8. **John Doe Defendants 1-10:** Once identified through discovery, these individuals and entities will be shown to have sufficient contacts with Washington (such as posting content from or targeting audiences in Washington) such that this Court's exercise of personal jurisdiction over them will be proper.

## C. Venue

1. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Specifically:

a. The Western District of Washington is located in Washington State, where Plaintiff resides;

b. A substantial part of the events giving rise to the claims occurred in this District. Specifically, the unlawful recording occurred on August 25, 2025, in Snohomish County, Washington, which is within this District. The accident and all immediate related events occurred in Arlington, Snohomish County, Washington, within this District;

c. Defendants Arevalo and Jimenez reside in Snohomish County, Washington, within this District;

d. The initial publication of the video occurred from Snohomish County, Washington, within this District;

e. The injury to Plaintiff was suffered primarily in Washington, within this District;

f. Therefore, venue is proper in the Western District of Washington, and specifically in the Seattle Division, as a substantial part of the events and the injury occurred here, and as multiple defendants reside here.

## III. PARTIES AND THEIR ROLES

### A. Plaintiff

1. **G.P.** is a 37-year-old individual residing in Washington State. She is a private figure—a single mother of two children, ages 8 and 11. She is a nurse practitioner, a licensed healthcare professional who works in patient care and whom patients entrust with their health and wellbeing.

2. Prior to the events giving rise to this lawsuit, Ms. G.P. deliberately maintained a private personal life and a limited online presence. She took deliberate steps to keep her children, her home, and her personal image out of widespread public view. She used privacy settings on social media accounts. She did not thrust herself into public controversies. She did not seek media attention. She was, by any measure, a private individual with a reasonable expectation that her personal moments, her conversations, and her image would remain private, especially when in a rented vehicle that she had no reason to believe contained recording devices of any kind.

**B. Defendant Jose Hernandez Arevalo**

1. **Jose Hernandez Arevalo** is an individual residing in Snohomish County, Washington. At all times relevant to this Complaint, Mr. Arevalo was the registered "host" of a vehicle made available for rental through Turo's peer-to-peer vehicle-sharing platform. He was the person who installed the hidden interior dashcam in the vehicle rented by Ms. G.P.. He is the person who, after accessing the dashcam footage and discovering that it contradicted Ms. G.P.'s initial account of the accident, made a deliberate and calculated decision to extract, edit, and publish that footage to social media with inflammatory captions designed to ridicule, humiliate, and falsely characterize Ms. G.P. as a liar and a dangerous reckless driver.

2. Mr. Arevalo is the direct and primary tortfeasor in this matter. His actions were not merely negligent or reckless. They were intentional, calculated, and motivated by personal spite and a desire for revenge. When Ms. G.P. explained her understanding of events during their telephone call immediately after the accident, Mr. Arevalo possessed knowledge that the dashcam footage contradicted her account. Rather than handling the matter as a private dispute between two adults—through insurance channels or direct

conversation—he chose to weaponize the footage, knowing that doing so would expose Ms. G.P. to public humiliation, professional harm, and emotional devastation.

## C. Defendant Maricela Jimenez

1. **Maricela Jimenez** is an individual believed to reside in Washington State, possibly in Snohomish County. Ms. Jimenez is the registered owner of the 2013 Nissan Leaf that was rented to Ms. G.P. on August 25, 2025. Upon information and belief, Ms. Jimenez either personally listed the vehicle on Turo or knowingly permitted Jose Hernandez Arevalo to do so on her behalf, with her authorization and knowledge. At all relevant times, Mr. Arevalo acted as Ms. Jimenez's agent, representative, or authorized co-host in operating and managing the Turo rental, including outfitting the vehicle with a dashcam and interacting with renters such as Plaintiff.

2. Ms. Jimenez is liable for the actions of Mr. Arevalo under principles of agency, vicarious liability, and joint enterprise. The vehicle was owned by Ms. Jimenez and placed into commerce through a Turo rental arrangement either personally managed by her or by an agent acting at her direction and with her knowledge and consent. Ms. Jimenez benefitted from the rental arrangement, either directly or indirectly. As owner of the vehicle that contained an undisclosed recording device, Ms. Jimenez either knew or should have known of the camera's presence, and failed to ensure it was disclosed to and consented to by renters.

3. In the alternative, Ms. Jimenez is liable under a theory of negligent entrustment. By knowingly allowing Mr. Arevalo to rent out her vehicle and install a recording device without taking steps to safeguard the privacy of renters, Ms. Jimenez failed to exercise reasonable care and facilitated the foreseeable harm to Plaintiff's rights. A reasonable vehicle owner who permits another to rent her vehicle on a commercial platform would take steps to ensure compliance with applicable privacy laws and platform policies. Ms. Jimenez's failure to do so constitutes negligence.

## D. Defendant Turo, Inc.

1. **Turo, Inc.** ("Turo") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in San Francisco, California. Turo operates a peer-to-peer vehicle-sharing platform that facilitates rental transactions between vehicle hosts and guests throughout Washington and the United States. Turo collects fees from every rental transaction, profits from the volume of rentals, and exercises significant control over the terms and conditions governing those transactions through its platform, Terms of Service, and policies.

2. At all times relevant to this Complaint, Turo was doing business in Washington State and derived substantial revenue from transactions here, including the rental transaction involving Ms. G.P. and Defendant Arevalo. Turo controlled or had the right to control certain aspects of every rental transaction, including setting terms of service that governed privacy protections and the use of recording devices in vehicles listed on its platform.

3. Turo has published, and actively enforces in some contexts, a policy requiring all hosts to disclose any interior recording devices to guests and to obtain affirmative consent from guests before activating such devices. The existence of this policy demonstrates that Turo understood—or should have understood—the serious privacy risks posed by interior dashcams. It demonstrates that Turo recognized the potential for harm to guests. And yet, despite having this policy, Turo failed to implement meaningful safeguards to ensure compliance.

**E. Defendant Meta Platforms, Inc.**

1. **Meta Platforms, Inc.** ("Meta") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Menlo Park, California. Meta owns and operates the social media platforms Facebook and Instagram. Meta's platforms are among the largest and most widely used social media networks in the world, with hundreds of millions of daily active users and billions of monthly users. Meta derives substantial revenue from advertising and from the engagement and time users spend on its platforms.

2. On or about August 30, 2025, Defendant Arevalo uploaded the illegal dashcam video to Facebook, under his personal profile, as a public post. Arevalo also shared the video to Facebook's Reels feature, a short-form video product designed for maximum visibility and engagement. Because Facebook and Instagram are both owned and operated by Meta and are integrated, the video became simultaneously visible on Instagram as well. Within hours of publication, Meta's algorithms—designed to maximize engagement by promoting sensational, shocking, and viral content—identified and actively amplified Mr. Arevalo's post, causing it to be reshared thousands of times and viewed by millions of people worldwide.

3. Plaintiff names Meta as a Defendant for the purpose of obtaining injunctive relief—specifically, to compel removal of the unlawfully obtained video from Meta's platforms and to prevent further republication via Meta's services. Plaintiff acknowledges that federal law (47 U.S.C. § 230) may limit Meta's liability for monetary damages for content posted by users. However, Plaintiff seeks equitable relief in the form of preliminary and permanent injunctions requiring Meta to remove the illegal content and prevent its re-posting. Meta's inclusion as a Defendant is necessary to provide complete relief and to ensure that the unlawfully obtained private content does not remain permanently available to the world via Meta's platforms.

**F. Defendant Reddit, Inc.**

1. **Reddit, Inc.** ("Reddit") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in San Francisco, California. Reddit operates an online platform comprised of thousands of community forums (called "subreddits") where users can post and discuss content. Reddit derives revenue from advertising and from the engagement time users spend on its platform. Reddit's services are accessed by millions of users in Washington State and worldwide.

2. After Mr. Arevalo posted the video to Meta's platforms, users on Reddit discovered and republished the video in multiple subreddits, including r/WinStupidPrizes, r/Whatcouldgowrong, and r/interestingasfuck. These Reddit threads received hundreds of

thousands of views and generated thousands of comments, many of which included identifying information about Ms. G.P. and engaged in harassment and mockery. Reddit's algorithms promoted and recommended these threads to millions of additional users.

3. Like Meta, Plaintiff names Reddit as a Defendant for purposes of obtaining injunctive relief—specifically, to compel removal of the unlawfully obtained video from Reddit's platform and to prevent further republication. Plaintiff seeks a permanent injunction requiring Reddit to remove all instances of the video and all derivative content, and to prevent re-uploading. Plaintiff acknowledges that federal law may limit Reddit's liability for monetary damages. However, equitable relief against Reddit is appropriate and necessary to fully vindicate Plaintiff's rights.

**G. Defendant YouTube, LLC**

1. **YouTube, LLC** is a limited liability company, a wholly-owned subsidiary of Alphabet Inc., organized under the laws of the State of Delaware with offices throughout the United States, including in Washington. YouTube operates the world's largest video-sharing platform, with billions of video views per day and billions of registered users. YouTube derives substantial revenue from advertising associated with video views.

2. The unlawful dashcam video was uploaded to YouTube in multiple instances by users (both by those directly sharing Arevalo's video and by those creating derivative content, commentary, or reposts). YouTube's recommendation algorithms promoted and suggested the video to millions of users. The video and related content remain accessible on YouTube's platform as of the date of this Complaint.

3. Plaintiff names YouTube as a Defendant solely for purposes of obtaining injunctive relief requiring removal of the unlawfully obtained video and related derivative content from YouTube's platform.

**H. Defendant Atlanta Black Star, Inc.**

1. **Atlanta Black Star, Inc.** is a news organization, believed to be organized under the laws of Georgia or operating as a division/brand of another entity. Atlanta Black Star operates the website AtlantaBlackStar.com, which publishes news articles and commentary on

topics of interest to African American audiences and the general public. Atlanta Black Star's website is accessible worldwide, including throughout Washington State, and Atlanta Black Star engages in interstate commerce by making its content available online.

2. On or about September 2, 2025, Atlanta Black Star published a news article about the incident involving Ms. G.P.. The article was headlined: "'She's Lucky She Could've Killed Someone!': Nurse Practitioner Exposed for Lying About Crash After Viral Dashcam Shows What She Was Really Doing Behind the Wheel." The article narrated the story, describing Ms. G.P. as a "Washington nurse practitioner" who crashed her car while texting, then "falsely blamed a phantom driver," and portrayed Arevalo as the innocent victim vindicated by dashcam footage.

3. Critically, the article included an unblurred still image extracted from the dashcam video, clearly showing Ms. G.P.'s face. The article also quoted directly from Mr. Arevalo's inflammatory social media captions ("Putting her on blast...she lied to my face..."). The article embedded or linked to the video itself. Although Atlanta Black Star did not publish Ms. G.P.'s full legal name, the combination of her image, identifying details (nurse practitioner, Washington location, vehicle make/model, specifics of the accident), and the screenshot from the video made her readily identifiable to anyone in her community.

4. Atlanta Black Star's publication further disseminated Plaintiff's identity and image to a national audience and contributed to the ongoing harassment and humiliation of Ms. G.P.. The article remains published and accessible online.

## I. Defendant Inside Edition, Inc.

1. **Inside Edition, Inc.** is a television newsmagazine program owned and distributed by a corporate entity (the precise legal entity to be confirmed in discovery, but likely Inside Edition Inc., or a subsidiary of CBS Media Ventures or parent company). Inside Edition broadcasts nationally and posts content online via its website and YouTube channel. Inside Edition's programming reaches millions of viewers daily, including in Washington State.

2.  On or about September 5, 2025, Inside Edition broadcast a segment about the incident involving Ms. G.P.. The segment was also posted online on Inside Edition's website and YouTube channel, where it remains accessible. The segment featured footage from the dashcam video, displaying Ms. G.P.'s face (unblurred), her voice (unblurred), and her visible distress. The segment's narrator described "a woman caught on camera texting and driving before crashing a rental car" and noted that "the owner says he's taking legal action because the woman tried to cover it up by claiming someone ran her off the road."

3.  While Inside Edition did not broadcast or publish Ms. G.P.'s full legal name, the segment's description, the displayed footage, and the context made clear they were discussing the same person from the viral video. Inside Edition's report framed the incident as a cautionary tale about distracted driving but presented Ms. G.P. in a negative light and contributed to the viral spread of her identity and image.

**J. John Doe Defendants 1-10**

1.  Plaintiff names John Doe Defendants 1-10 to represent currently unidentified persons and entities who have participated in republishing, amplifying, or otherwise disseminating the unlawful content in violation of Ms. G.P.'s privacy rights. These may include operators of viral video accounts (such as the Instagram account @dashcam.encounters, which has a large following and reposted the video with captions); YouTube creators who made commentary videos or derivative content; Reddit users and moderators; users of other platforms; or other online actors who obtained and redistributed the illegal content.

2.  Upon identification through discovery and investigation, Plaintiff will amend this Complaint to insert the true names and capacities of these Defendants. Their participation in the wrongful acts or their role in continued republication makes them appropriate parties to this action, and they should be bound by any injunctions this Court issues.

**IV. FACTUAL ALLEGATIONS**

**A. The Rental and the Hidden Recording Device**

1.  On August 23, 2025, Ms. G.P. used Turo's online platform to book a one-day rental of a 2013 Nissan Leaf electric vehicle. She selected a specific vehicle listed by a host named Jose Hernandez Arevalo. The rental was confirmed for August 25, 2025, with pickup and return in Bothell, Washington.

2.  Ms. G.P. went through Turo's standard booking process. At no point—not during the online booking, not in any pre-rental communication, not during pickup—did Turo, Defendant Arevalo, or any representative inform Ms. G.P. that the vehicle contained any recording device whatsoever. There was no disclosure. There was no opportunity for Ms. G.P. to provide consent. There was no warning.

3.  Unbeknownst to Ms. G.P., the vehicle was equipped with an interior-facing dashcam that recorded not only video of the road ahead but also video of the vehicle's interior—including the driver's seat and passenger area—and audio of all conversations and sounds within the cabin. The camera was positioned and configured to capture the driver's face, expressions, actions, and voice.

4.  Turo's published policies require that any host using a recording device with interior or audio capability must disclose that device to guests and obtain affirmative, written consent before the device is activated during a rental. Turo's policy reflects an explicit acknowledgment that interior recording devices pose a serious privacy risk and that renters should have the opportunity to make an informed choice about whether to consent to being recorded.

5.  Defendant Arevalo violated Turo's policy. He did not disclose the camera. He did not seek Ms. G.P.'s consent. He did not provide any notice. By failing to disclose, Arevalo affirmatively denied Ms. G.P. the opportunity to make an informed choice about her own privacy and to protect her own interests. Had Ms. G.P. been informed that the vehicle contained an interior recording device, she would not have consented to being recorded. In fact, she would not have rented the vehicle. A person is entitled to expect that private conversations and personal moments inside a rented vehicle are not being captured without their knowledge.

6. Defendant Turo failed to enforce its own privacy policy. Turo's system did not flag, alert, or warn Ms. G.P. about the presence of any interior recording device. Turo did not require Arevalo to provide documentation that he had disclosed the camera and obtained written consent from Ms. G.P.. Turo's platform allowed Arevalo to list the vehicle, accept Ms. G.P.'s rental booking, and complete the rental transaction without any verification that Turo's stated privacy protections were in place.

7. A reasonably diligent company—particularly one that explicitly promulgates privacy policies—would have implemented technical or procedural safeguards to ensure compliance. For example, Turo could have required Arevalo to certify within the app that no interior camera was active (or that it was disclosed and consented to). Turo could have flagged hosts with prior complaints about recording devices. Turo could have implemented a mandatory disclosure flow through its app that required affirmative, documented consent from the guest. Turo did none of these things.

8. Ms. G.P. picked up the vehicle in Bothell on the morning of August 25, 2025, entirely unaware that she was being placed under electronic surveillance—that every word she spoke, every phone call she made, every moment of her private behavior and emotional state, would be captured in digital form by a hidden device inside the vehicle.

**B. The Accident**

1. On the afternoon of August 25, 2025, Ms. G.P. was driving the Nissan Leaf in a rural area near Arlington, Snohomish County, Washington. She was unfamiliar with the vehicle. She was rushing to return it by the agreed-upon time. While driving, she experienced a moment of distraction and panic. In that moment—a split-second decision to glance at her phone to send a quick message about the return time—her attention lapsed.

2. The vehicle drifted off the roadway. The Leaf struck a roadside mailbox and a shallow ditch. The airbag deployed. The vehicle sustained significant damage and became disabled. Ms. G.P. was physically shaken and scared. She suffered minor injuries—

bruising from the airbag impact and a sprained wrist—but no serious or permanent physical harm.

3. More significantly, Ms. G.P. experienced acute psychological shock and trauma. She was disoriented and confused. Her mind was flooded with adrenaline and fear. In this state of acute distress, she briefly lost her sense of what had happened. She was not certain whether another vehicle had been involved. Due to a combination of shock, disorientation, and a previous traumatic automobile accident from months earlier (which her mind briefly triggered), Ms. G.P. formed the mistaken belief that perhaps another vehicle had forced her off the road.

4. Law enforcement deputies from the Snohomish County Sheriff's Office arrived at the scene. Ms. G.P., still emotionally distraught and disoriented, reported to the deputies that she believed another vehicle had cut her off or forced her off the road. This account was mistaken. No other vehicle was involved. Ms. G.P.'s moment of distraction—her own error in judgment—was solely responsible for the accident.

5. The sheriff's deputies took an incident report. Because Ms. G.P. was the only person present and there was no evidence of another vehicle, the incident was recorded as a single-vehicle accident. No citations were issued against Ms. G.P. for distracted driving or any other violation. She was not charged. She was not arrested. She was treated as a private individual who had made a human error—a momentary lapse that happens, regrettably, to many people.

**C. Immediately After the Accident: First Notice of the Camera**

1. Immediately after the accident, while still in a state of acute shock and trauma, Ms. G.P. called the Turo host, Defendant Arevalo, to report that she had been involved in an accident and that his vehicle was damaged. Ms. G.P. was in severe distress. She expected to be responsible for the damage and was prepared to address it through insurance and reimbursement.

2. During that call (at approximately 6:45 PM on August 25, 2025), Ms. G.P. described what she believed had happened—that she thought another vehicle had forced her off the road. She expressed deep remorse and apologized.

3. Arevalo's response was curt and dismissive. Notably, he asked Ms. G.P., "Did you have the dash cam plugged in?" This question was the first and only notice that Ms. G.P. received indicating that any recording device existed in the vehicle. She was shocked and confused. She had not noticed any camera, nor had she seen anything that suggested one existed. She had not unplugged anything.

4. Arevalo then said, in substance, "If you didn't unplug it, it's probably all on video." Ms. G.P., still in shock and desperately hoping that some external evidence might validate her confused recollection of events, responded hopefully that perhaps the camera had recorded proof of the other car that she mistakenly believed had forced her off the road. She had no idea at that moment that she had just been told of an unlawful secret recording—a gross invasion of her privacy that violated federal law.

5. The call ended with Ms. G.P. expressing remorse and stating that she would handle the situation through insurance. Arevalo did not indicate anger or give any hint of his intention to use the footage to humiliate her. In fact, his question about the dashcam might have seemed casual or routine to Ms. G.P.—perhaps, she thought, he was asking because he wanted her to turn it off to preserve the footage for insurance purposes.

**D. Arevalo Accesses and Reviews the Illegal Recording**

1. Over the days following the accident, Defendant Arevalo retrieved the damaged vehicle from impound or otherwise accessed the memory card or storage device from the dashcam. He reviewed the recordings in their entirety.

2. The footage clearly showed what had actually occurred: Ms. G.P. had been glancing at her phone in the moments before the crash; no other vehicle was visible on the video; her distraction alone caused her to lose control; the accident was a single-vehicle incident entirely of her own making.

3. This discovery appears to have enraged Defendant Arevalo. Ms. G.P.'s initial account to him—that she believed another vehicle had forced her off the road—had been wrong. She had either lied to him (in his view) or had been incredibly careless in reporting to him. His vehicle was totaled. His emotions escalated.

4. Rather than handling the matter as a straightforward dispute between two adults—through Turo's claims process, through insurance channels, or even through direct conversation with Ms. G.P. (who by then may have realized her mistake)—Arevalo made a deliberate, calculated decision to punish Ms. G.P.. He decided to "put her on blast," in his own words. He decided to expose her to public humiliation and shame by publishing the illegal recording.

5. Arevalo was not motivated by any legitimate public interest. He was not attempting to educate the public about the dangers of distracted driving (there are a thousand neutral ways to do that without exposing a private person). His motivation was personal revenge. He had been angered by what he perceived as Ms. G.P.'s deception or carelessness. He had decided to weaponize the illegally obtained footage to humiliate and shame her publicly.

**E. The Illegal Recording Itself: Federal and Washington Law Violations**

1. Before detailing the publication and viral spread, it is critical to establish that Arevalo's recording of Ms. G.P. itself constituted criminal and civil violations of federal and Washington law.

2. Under 18 U.S.C. § 2511, the Federal Wiretap Act makes it unlawful for any person to intentionally intercept, or procure any other person to intercept, any oral communication "by means of any mechanical, electronic, or other device" without the consent of all parties to the communication.

3. Ms. G.P.'s voice, her private utterances, and her phone conversations inside the vehicle constitute "oral communications." They occurred in the interior of a rental vehicle, a setting where Ms. G.P. had a reasonable expectation of privacy. Defendant Arevalo recorded these communications using an electronic device (the dashcam) without Ms.

G.P.'s consent. He had not informed her that a camera existed. She could not have consented.

4. Similarly, under RCW 9.73.030, Washington's Privacy Act, it is unlawful to record any private oral communication or conversation "without first obtaining the consent of all persons engaged in the communication." Washington is an all-party consent state. The fact that Arevalo himself may have been a party to a telephone conversation with Ms. G.P. does not exempt him from the consent requirement. Even a party to a conversation cannot unilaterally record it in Washington without the other party's knowledge and agreement.

5. Arevalo's recording violated both statutes. The violations are clear, undisputed, and egregious.

6. No exception to these laws applies. This was not an authorized law enforcement recording. This was not a situation involving threats or emergency circumstances. This was a routine private context in which Arevalo had no authority whatsoever to record Ms. G.P. without consent.

**F. Publication to Meta's Platforms: The Viral Spread Begins**

1. On or about August 30, 2025, approximately five days after the accident, Defendant Arevalo edited the dashcam footage into a short video compilation and published it to social media. He posted it to Facebook under his personal profile as a "public" video visible to all users. He also shared it to Facebook's Reels feature, a short-form video product specifically designed for maximum visibility and rapid distribution.

2. The video contained both the forward-facing dashcam footage (showing the road and the vehicle's path) and the interior-facing footage (showing Ms. G.P. clearly, her face unblurred and unmistakable, her expressions, her distress, her voice as she screamed in panic when the vehicle impacted the mailbox and ditch). The interior footage also captured her work identification badge hanging from a lanyard around her neck—a badge bearing her first name, "G.P.," and identifying her workplace.

3. In the caption accompanying the video, Arevalo wrote a deliberately inflammatory and accusatory message. In substance, it read:

"This is what happens when you TEXT AND DRIVE. My Turo renter told me someone ran her off the road... but look at this! 🤦 "

And then:

"Putting her on blast because she lied to my face when I had proof she was on her phone."

1. Arevalo added hashtags including #distracteddriving, #dashcam, #instantkarma, and similar tags—tags designed specifically to maximize visibility, engagement, and algorithmic promotion.

2. This caption did far more than simply present a video of a traffic accident. The caption explicitly accused Ms. G.P. of lying. It framed her initial account (that she thought another vehicle was involved) as a deliberate deception—a lie told "to [Arevalo's] face." The caption was designed to invite moral judgment and condemnation. It invited observers to join in shaming her.

3. Because Facebook and Instagram are both owned and operated by Meta and are integrated, the video became simultaneously viewable on Instagram as well. Within hours of publication, Meta's proprietary algorithms—specifically designed and programmed to maximize engagement by identifying and promoting sensational, shocking, and inflammatory content—picked up Arevalo's post and amplified it aggressively.

4. The video was reshared thousands of times on Facebook. The Reels version garnered millions of views within a matter of days. Millions of strangers, worldwide, saw Ms. G.P.'s face. Heard her voice. Witnessed her moment of maximum psychological vulnerability and panic. Learned her first name and her occupational identity. Were presented with Arevalo's false characterization that she had lied to him about the cause of the accident.

**G. Spread to Reddit and Other Platforms**

1. Within days of Arevalo's publication to Meta's platforms, users on Reddit discovered the video and republished it. A Reddit user posted the footage to the subreddit

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

r/WinStupidPrizes (a community dedicated to videos of people experiencing negative consequences for poor decisions) with the title "Top notch moron texting and driving."

2. That thread gained enormous traction. It amassed hundreds of comments, many of them cruel and mocking. In that thread and in another in r/interestingasfuck, users explicitly discussed that "this happened in Washington," that the person involved "is a nurse practitioner," and that she had "lied about another car." Some commenters noted that they recognized her face or badge.

3. The threads generated millions of views. Many commenters engaged in name-calling, expressions of contempt, and harsh judgments. For example:

"Thank god she didn't veer into oncoming traffic and ruin someone else's life. Idiot."

"Imagine trying to lie about this... Now she's a meme and no one that knows her will ever let her borrow a car again."

"She's lucky she didn't kill anyone. Also, she straight up lied to the guy. Zero sympathy."

1. An Instagram account with the handle @dashcam.encounters, which curates and reposts dashcam footage, also reposted the video with a caption admonishing distracted driving. That account has a large following, adding millions of additional views.

2. The video appeared on TikTok in multiple forms—some users stitching or commenting on it, others reposting it directly. One TikTok video captioned "When she says a car ran her off the road but dashcam shows she was on her phone" received hundreds of thousands of likes.

**H. Publication by Mainstream Media Outlets**

1. By early September 2025, the story had been picked up by mainstream news outlets, further amplifying the harm and broadening the exposure of Ms. G.P.'s identity to new audiences.

2. **Atlanta Black Star:** On or about September 2, 2025, Atlanta Black Star published an online news article about the incident. The article's headline explicitly framed Ms. G.P. as a liar and a hypocrite:

"'She's Lucky She Could've Killed Someone!': Nurse Practitioner Exposed for Lying About Crash After Viral Dashcam Shows What She Was Really Doing Behind the Wheel."

1. The article narrated the incident in detail, describing Ms. G.P. as a "Washington nurse practitioner" who crashed her car while texting and then "falsely blamed a phantom driver." The article quoted Arevalo's inflammatory captions directly ("Putting her on blast because she lied to my face..."). Critically, the article included a still image extracted from the dashcam video—an unblurred, unmistakable photograph of Ms. G.P.'s face.

2. Although Atlanta Black Star did not publish Ms. G.P.'s full legal name (last name), the combination of her photograph, her first name (G.P.), her profession (nurse practitioner), the specific location (Washington), and the details of the incident made her readily identifiable to anyone in her professional community or personal circles.

3. The article was widely shared on Facebook and Twitter, further exacerbating Ms. G.P.'s exposure and amplifying the false narrative that she had deliberately lied.

4. **Inside Edition:** On or about September 5, 2025, the nationally syndicated television program Inside Edition broadcast a segment about the incident. The segment was also posted online on Inside Edition's website and YouTube channel, where it remains accessible.

5. The Inside Edition segment featured clips from the dashcam video, displaying Ms. G.P.'s face unblurred, her voice clearly audible, her visible panic and distress. The segment's narrator described "a woman caught on camera texting and driving before crashing a rental car" and noted that "the owner says he's taking legal action because the woman tried to cover it up by claiming someone ran her off the road."

6. While Inside Edition did not name Ms. G.P. or broadcast her full legal name, the footage and description left no doubt that they were discussing the same person from the viral video. The segment was framed as a cautionary tale about the dangers of distracted driving but presented Ms. G.P. in a negative, condemning light and contributed to the widespread recognition and identification of her image and story.

## I. The Critical Missing Element: No Acknowledgment of Illegality

1. Nowhere in any of these news reports, Reddit discussions, or social media posts was there any acknowledgment of the critical fact: the video was obtained illegally, in direct violation of federal and Washington law, without Ms. G.P.'s consent.

2. Nowhere did any outlet or commenter note that the person who obtained and published the video—Defendant Arevalo—had committed a federal crime by intercepting and recording Ms. G.P.'s private oral communications without consent.

3. Nowhere did outlets reference Washington's Privacy Act or acknowledge that Arevalo's recording violated RCW 9.73.030.

4. Instead, the narrative presented to the public was a simple and sensational one: a nurse practitioner had been "caught red-handed" texting and driving, had lied about it, and deserved to be publicly exposed and shamed. The illegality of the evidence used to "catch" her was ignored. The privacy violation that made the exposure possible was not discussed.

5. This omission was critical. It allowed Arevalo to be perceived as a victim and truth-teller rather than a violator of federal criminal law. It allowed the media outlets to present themselves as exposing dangerous behavior rather than as accessories to privacy violations. And it allowed the public to engage in what amounted to mob harassment of Ms. G.P. without understanding that the entire premise rested on illegal surveillance.

**J. Identification, Doxing, and Harassment**

1. Although Arevalo did not publish Ms. G.P.'s full legal name in his initial social media post, the video itself effectively identified her to anyone in her personal, professional, or social circles, and even to determined internet users capable of assembling clues.

2. In the interior video, Ms. G.P. is clearly visible wearing her work badge on a lanyard. The badge displays her first name: "G.P.." "G.P." is an uncommon name. In the video, Ms. G.P. is wearing medical scrubs, making clear that she works in healthcare. Secondary posts and comments (from other users who reposted the video and from mainstream media outlets) explicitly identified her as a "nurse practitioner" in Washington State.

3. A person living in Washington State who sees a video of someone in scrubs and medical badging with the uncommon name "G.P." and knows that this person is a nurse practitioner has more than enough information to identify Ms. G.P., especially if they live or work in her community.

4. Within a day or two of the video's initial publication, Ms. G.P.'s personal Facebook and Instagram accounts were discovered and targeted by online trolls and harassers. These accounts, maintained under her name with some public-facing posts, were bombarded with hateful messages and comments from strangers worldwide who had connected the video to her identity.

5. The harassment was vicious, dehumanizing, and relentless. Some examples of the messages and comments Ms. G.P. received (both directly and in response to her accounts, which she could see) included:

"Is this the chick that crashed the car while texting? LOL. What an idiot."

"You're a disgrace to nurses. Patients shouldn't have to trust someone so irresponsible."

"I hope CPS takes your kids since you can't even be responsible on the road. #BadMother"

"Women shouldn't be allowed to drive. This is why."

"You should be fired. No wonder there's a nursing shortage—we have incompetent people like you."

Explicit, sexually demeaning comments.

Comments threatening her safety and her children's safety.

1. Much of the harassment invoked misogynistic stereotypes about women drivers. Many comments attacked her professional reputation and her fitness as a mother. Many suggested that her children were at risk due to her supposed recklessness. The harassment was, as Ms. G.P. has described it, an "avalanche"—a flood of cruelty from strangers who had latched onto the false narrative that she was a liar and a danger.

**K. The Profound and Ongoing Devastation to Ms. G.P.**

1. On August 31, 2025, Ms. G.P. received a text message from a friend: "Were you in a car accident a couple days ago? Because I think I saw a video of you on Reddit..."

2. In that moment, Ms. G.P.'s heart sank. She searched for the video and found it. She saw her own face, unmistakable. She heard her own voice screaming in panic. She saw her moment of maximum vulnerability broadcast to millions of strangers. She was devastated. She was mortified. She felt profoundly violated.

3. Over the course of the following weeks and beyond, Ms. G.P.'s life descended into a living nightmare from which she has not fully recovered.

**Harassment and Violation:**

1. Ms. G.P.'s personal social media accounts were flooded with hateful messages from strangers around the world. These comments ranged from accusatory to threatening to explicitly misogynistic. People dug through her social media to find photos of her children (accessible through friends' pages) and posted cruel comments targeting her parenting and her children's safety. Someone located an old LinkedIn profile and began messaging people in her professional network, asking if they recognized the woman in the viral video.

2. Ms. G.P. felt hunted. She felt that her privacy, her family's privacy, and her identity had been stolen and weaponized against her.

**Loss of Digital Privacy:**

1. Feeling overwhelmed and violated, Ms. G.P. shut down all of her social media accounts by September 3, 2025. She changed her personal cell phone number after receiving multiple calls from strangers who had used internet sleuthing to locate her contact information. She felt that she could not maintain any digital footprint without fear of harassment and further invasion.

**Professional Humiliation:**

1. At her workplace, the effect was immediate and chilling. Colleagues whispered about the video. Several who recognized her approached her privately to ask if she was okay, their questions tinged with concern or awkwardness. While her employer did not formally reprimand her, there was an implicit atmosphere of embarrassment and discomfort permeating her workplace.

2. Patients who had viewed the viral video on social media canceled appointments with her. One patient, in what was apparently meant as humor, joked, "You won't text and drive on the way to my home visit, right?" The comment, whether intended as kindly banter or not, was deeply humiliating. It confirmed that Ms. G.P., a healthcare professional who had spent years building trust with her patients, was now known to them first and foremost as "that nurse who crashed her car while texting and lied about it."

**Reputational Injury:**

1. Ms. G.P.'s professional reputation in her community—which is not vast, and where personal and professional reputation matter greatly—took a significant and lasting hit. She fears permanent damage. As a nurse practitioner, trust and responsibility are paramount. Patients entrust healthcare providers with their health, their bodies, their medical vulnerabilities. That relationship depends entirely on the patient's confidence in the provider's judgment, competence, honesty, and reliability.

2. Now, many in Ms. G.P.'s local community know her through the distorted lens of the viral video—as a woman who was caught texting and driving, who lied about it, and who is irresponsible and untrustworthy. It is an unfair and fundamentally false characterization. It does not reflect who Ms. G.P. is as a person, a professional, or a mother. But it is the narrative that has been established in the minds of countless people—a narrative that she did not create, that she did not invite, and that she had no ability to control.

**Psychological and Emotional Trauma:**

1. The mental and emotional toll on Ms. G.P. has been severe and ongoing. She experienced acute anxiety, panic attacks, and depression in the immediate aftermath. She struggled with insomnia. She experienced intrusive thoughts about the incident, the video, and the harassment. Worst of all, she developed a profound fear of being recognized in public.

2. She accelerated her mental health treatment. Before the incident, Ms. G.P. had been attending monthly therapy sessions as part of her routine mental health maintenance. After the incident, she immediately increased her sessions to twice weekly. She is

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**ROSSI & CO. PC**
616 33ᴿᴰ AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

26

addressing not only the acute trauma of being illegally recorded, publicly humiliated, and harassed on a global scale, but also pre-existing trauma from a previous automobile accident from years earlier, which the current incident has reactivated and re-triggered.

3. For a period of time after the incident, Ms. G.P. could not bring herself to drive at all. This was not solely because of the accident trauma (the physical experience of the crash itself). It was because of fear that people on the road might recognize her from the video and react with hostility toward her. This fear was not paranoid or unfounded. It was realized. On one occasion at a gas station, a stranger recognized her from the video and asked aloud, "Hey, are you that lady from the texting video?" Ms. G.P. was deeply shaken by the encounter. She felt hunted. She felt that her anonymity—the basic shield that allows a private person to move through the world without fear—had been permanently stripped away.

**Guilt and Self-Blame:**

1. Ms. G.P. also experienced deep shame and guilt. Part of her knows, rationally, that she made a mistake—a momentary lapse of judgment while driving, a decision to glance at her phone. She regrets that error profoundly. She recognizes her culpability for the accident itself. She has never denied her mistake.

2. But the public shaming and viciousness that followed—the sensation of being branded and pilloried by internet strangers—has twisted that reasonable remorse into something darker and more self-destructive. She has internalized the narrative that was imposed upon her. She has begun to blame herself not just for the accident, but for the harassment, the invasion of privacy, the exposure of her identity. Rationally, she understands that this is not fair. But the psychological weight of being publicly shamed has crushed her sense of self-worth.

**Loss of Basic Freedoms:**

1. Ms. G.P. lives in a state of ongoing fear and dread. The video, while less viral now than at its peak in early September, still circulates in certain corners of the internet. Every time it resurfaces—every time someone shares it again, or discovers it anew on Reddit or

YouTube or some other platform—Ms. G.P. experiences a resurgence of her acute trauma.

2. She lives in constant dread that new people in her life—new neighbors, new acquaintances, new patients or colleagues, PTA parents at her children's school, potential romantic interests, future employers—will discover the video and connect it to her. She anticipates rejection and judgment from each new person she meets.

**Loss of Control Over Her Image and Identity:**

1. Ms. G.P.'s greatest and most ongoing injury is the permanent loss of control over her own image and identity. Her face, her voice, and her identifying information have been placed into the public domain without her consent. That footage persists online indefinitely. It is searchable. It is shareable. It is accessible to anyone who searches for her name. Ms. G.P. cannot erase it. She cannot recover it. She cannot restore the privacy she once had.

2. She exists now as a permanent subject of public ridicule, speculation, and scrutiny—not because she sought that exposure, but because one man decided to punish her by weaponizing an illegally obtained recording, and because platforms and media outlets amplified that recording for engagement and ratings without understanding or disclosing its illegal origins.

**L. The Statutory Basis for Privacy Protection: Why These Laws Exist**

1. The Federal Wiretap Act (18 U.S.C. § 2511 et seq.) was enacted to protect Americans from unlawful electronic surveillance of their private communications. Congress recognized that the advancement of technology created new and serious threats to privacy. The statute criminalizes the interception of private communications and provides for civil liability, including statutory damages of $100 per day of violation or $10,000 per violation, whichever is greater, plus punitive damages and attorneys' fees.

2. The existence of statutory damages—not tied to proof of actual pecuniary loss—reflects Congress's judgment that privacy violations cause harm that is difficult to quantify but serious nonetheless. The damage to a person's dignity, autonomy, and sense of safety

from being secretly recorded cannot be easily measured in dollars. The statute therefore provides a meaningful floor of compensation to deter such conduct.

3. Washington State enacted RCW 9.73.030, its Privacy Act, in recognition of a fundamental truth: people have a constitutional and legal right to expect that their private conversations will not be secretly recorded or intercepted. The statute provides that it is unlawful to record any private oral communication or private conversation by any device, electronic or otherwise, without first obtaining the consent of all persons engaged in the communication.

4. This statute is grounded in the constitutional principle that every person has a fundamental right to privacy in their communications. The statute exists to protect ordinary citizens like Ms. G.P. from exactly what happened to her: the secret electronic surveillance of her private moments, her private conversations, her private thoughts expressed in spaces where she had a reasonable expectation that she was not being listened to or recorded.

5. The statute reflects a deliberate legislative choice rooted in a specific value: in Washington, we do not allow one person to unilaterally decide to record another person's conversations or private utterances. We recognize that the human dignity and autonomy of the person being recorded are at stake. We recognize that secret recording is inherently degrading—it violates the person's ability to control what is known about her, how her words and actions are presented to the world, and how others will perceive her. It treats her not as an autonomous being but as an object to be captured and used.

6. Washington's Privacy Act provides that violations give rise to civil liability with statutory damages of **not less than $1,000 per violation**, plus reasonable attorneys' fees and costs. These statutory damages are not accidents of legislative drafting. They reflect the Washington Legislature's judgment that the harm caused by privacy violations is serious, that it is difficult to quantify the full extent of that harm, and that we should provide a meaningful floor of compensation to anyone whose right to privacy is violated in this way.

7. Defendant Arevalo violated both the Federal Wiretap Act and Washington's Privacy Act. He recorded Ms. G.P. without her consent. He did so in a private setting—inside a vehicle. He recorded her verbal communications—both her phone call with him and her personal utterances after the accident. He recorded the audio of her voice. The violations are clear, undisputed, and egregious.

8. More significantly, Arevalo did not merely record Ms. G.P.. He used the fruits of that illegal recording to humiliate her, to expose her to the world, and to subject her to the exact kind of public pillorying that these statutes were designed to prevent.

## V. CAUSES OF ACTION

## COUNT I – VIOLATION OF FEDERAL WIRETAP ACT

## (18 U.S.C. § 2511 and § 2520)

## Against Defendant Jose Hernandez Arevalo

1. Plaintiff re-alleges and incorporates by reference all preceding paragraphs and allegations.

2. Defendant Jose Hernandez Arevalo violated 18 U.S.C. § 2511 by intentionally intercepting private oral communications without the consent of Ms. G.P..

3. **The Statutory Prohibition:** 18 U.S.C. § 2511(1)(a) provides that it shall be unlawful for any person to **intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any telephonic, electronic, or radio communication, or any oral communication**, **by means of any mechanical, electronic, or other device**, or for any person to attempt to intercept, or for any person to use, or attempt to use, the contents of any such intercepted communication, knowing or having reason to know that such information was obtained by interception of a private communication, **without first obtaining the consent of all parties to such communication**.

4. **Arevalo's Conduct:** Defendant Arevalo installed and activated an interior-facing dashcam in the rental vehicle—an electronic device capable of intercepting and recording oral communications. The device recorded:

a. Ms. G.P.'s private phone conversation with Defendant Arevalo himself on August 25, 2025, immediately after the accident (at minimum, the portion of the call in which Ms. G.P. spoke);

b. Ms. G.P.'s private utterances and exclamations made when she believed she was alone inside the vehicle (e.g., her panicked scream when the vehicle crashed; any comments she made to herself while driving; any other vocalizations);

c. Any other in-vehicle communications or conversations during the rental period.

1. All of these constitute "oral communications" as defined by the statute—communications containing speech, sound, or voice occurring in a private setting.

2. **Intentionality:** Defendant Arevalo intentionally installed the recording device. He intentionally activated it. He intentionally allowed it to record Ms. G.P. without her knowledge. There is no question of intent.

3. **Lack of Consent:** Ms. G.P. never consented to being recorded. She was never informed that a recording device was present. She was never given an opportunity to consent or decline. The only notice she received was Arevalo's question—"Did you have the dash cam plugged in?"—which came only after the accident had occurred. By that point, the recording was complete. She had been recorded without any possibility of meaningful consent.

4. **Private Setting:** The interior of a rental vehicle is a quintessentially private setting. Ms. G.P. was inside a closed vehicle. She was not in public. She had a reasonable and well-founded expectation of privacy. She did not broadcast her communications. She did not invite recording.

5. **Washington's All-Party Consent Rule:** While 18 U.S.C. § 2511 allows some states to operate under a "one-party consent" rule (permitting a party to a conversation to record it without the other party's knowledge), Washington State is a jurisdiction that requires all-party consent. Washington law (RCW 9.73.030) is stricter than the federal baseline. That

state law is applicable here. But even under the federal statute, the spirit and intent is to protect privacy. And here, even under a one-party consent interpretation, Arevalo's conduct would be problematic because he recorded Ms. G.P.'s private utterances and exclamations when she was alone—communications to which Arevalo was not a party.

6. **Statutory Damages:** Under 18 U.S.C. § 2520, any person whose private communication is intercepted without consent "shall be entitled to recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate." Specifically, § 2520(b) provides:

"(1) In an action under subsection (a), or in a civil action or proceeding before a court of competent jurisdiction, the court may assess as damages whichever is greater— (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of **not less than $100 a day for each day of violation or $10,000, whichever is greater**."

1. Additionally, § 2520(b)(3) provides for **punitive damages** and § 2520(c) provides for **reasonable attorneys' fees and other litigation costs**.

2. Defendant Arevalo's violation is clear. At minimum, if the August 25, 2025 recording constitutes a single violation, Plaintiff is entitled to statutory damages of $10,000, plus actual damages if greater, plus punitive damages, plus attorneys' fees.

3. However, depending on how violations are calculated—whether by distinct conversation, by day of recording, or by instance of recording different communications—there may be multiple distinct violations. For example:

a. The phone call with Arevalo = one violation;

b. Ms. G.P.'s private utterances/exclamations = additional violation(s);

c. Each distinct private communication = potential separate violation.

1. Even a conservative interpretation yields multiple violations and thus damages of at least $20,000 in statutory damages alone, to which actual damages and fees would be added.

2. Plaintiff has suffered harm as a direct result of the unlawful recording and its exploitation. While the statute allows recovery even absent proof of special damages,

Plaintiff has in fact suffered severe emotional distress, reputational harm, loss of privacy, psychological injury, and other damages directly flowing from the unlawful recording.

3. Plaintiff seeks statutory damages of $10,000 per violation (or potentially multiples thereof), actual damages, punitive damages, and reasonable attorneys' fees and costs, all pursuant to 18 U.S.C. § 2520.

**COUNT II – VIOLATION OF WASHINGTON PRIVACY ACT**

**(RCW 9.73.030 and RCW 9.73.060)**

**Against Defendant Jose Hernandez Arevalo**

1. Plaintiff re-alleges and incorporates by reference all preceding paragraphs and allegations.

2. Defendant Jose Hernandez Arevalo violated RCW 9.73.030, Washington's Privacy Act, by intentionally recording Ms. G.P.'s private oral communications without her consent.

3. **The Statutory Prohibition:** RCW 9.73.030 provides:

"It shall be unlawful for any person to **intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any telephonic, electronic, or radio communication**, or any oral communication, **by means of any mechanical, electronic, or other device**, or for any person to attempt to intercept, or for any person to use, or attempt to use, the contents of any such intercepted communication, knowing or having reason to know that such information was obtained by interception of a private communication, **without first obtaining the consent of all parties to such communication**."

1. **All-Party Consent:** Washington is an all-party consent state. This means that unlike some states that allow one party to a conversation to record it without the other's knowledge, Washington requires consent from **all** parties. Even if Arevalo had been a party to Ms. G.P.'s phone call, he could not lawfully record it without her consent. And for her private utterances—to which Arevalo was not a party—the requirement is even clearer.

2. **Arevalo's Violation:** Arevalo intentionally recorded Ms. G.P.'s private oral communications—her voice, her statements, her utterances—using an electronic device (the dashcam) without her knowledge or consent.

3. **No Exception Applies:** There is no exception to RCW 9.73.030 that would justify Arevalo's conduct. This was not:

a. An authorized law enforcement recording;

b. A recording involving threats or imminent harm;

c. A recording with emergency circumstances;

d. Any other situation that might justify warrantless surveillance.

This was a routine private context in which Arevalo had no authority to record.

1. **Civil Liability:** RCW 9.73.060 provides the civil remedy for Privacy Act violations: "Any person whose private communication is intercepted, disclosed, or used in violation of RCW 9.73.030 through 9.73.050, shall be entitled to recover from any person or entity which engaged in or authorized such violation such relief as may be appropriate, including **damages, specific performance, injunctive relief, and reasonable attorneys' fees and other costs incurred in connection with the suit**; and the prevailing party may, in the discretion of the court, recover such relief."

1. The statute further provides that damages shall be "not less than **$1,000 for each separate violation** or actual damages, whichever is greater."

2. Arevalo's violation of RCW 9.73.030 is undisputed. The recording itself constitutes at least one violation. Depending on how "separate violations" are calculated (by day, by distinct communication, etc.), there may be multiple violations, each entitling Plaintiff to $1,000 in statutory damages.

3. Plaintiff has suffered actual damages far exceeding $1,000, including severe emotional distress, reputational harm, professional damage, therapy costs, and other harms.

4. Plaintiff is entitled to recover statutory damages of not less than $1,000 per violation, actual damages, reasonable attorneys' fees, and costs, pursuant to RCW 9.73.060.

5. Additionally, under RCW 9.73.050, any recording made in violation of RCW 9.73.030 is inadmissible in any civil or criminal proceeding. This provision underscores the seriousness of the violation and demonstrates that Washington law does not permit the use of illegally obtained recordings, even in legal proceedings. Plaintiff invokes this provision to ensure that any illegally obtained audio content cannot be used by Defendants in defending this action.

**COUNT III – INTRUSION UPON SECLUSION**

**(Washington Common Law – Invasion of Privacy)**

**Against Defendants Jose Hernandez Arevalo and Maricela Jimenez**

1. Plaintiff re-alleges and incorporates by reference all preceding paragraphs and allegations.

2. Washington law recognizes the tort of invasion of privacy in the form of "intrusion upon seclusion." This tort protects a person's right to be free from unwanted intrusion into her private affairs, in a manner that is highly offensive to a reasonable person.

3. Defendant Jose Hernandez Arevalo intentionally and knowingly intruded upon the solitude and seclusion of Plaintiff in a manner that is highly offensive to any reasonable person. Specifically:

a. Without Plaintiff's knowledge, permission, or consent, Arevalo installed and maintained an interior-facing recording device (dashcam) in the rental vehicle;

b. The device was positioned and configured to record the vehicle's interior, including the driver's seat and passenger areas;

c. The device was configured to capture audio—Plaintiff's voice, her conversations, her private utterances;

d. Arevalo activated this device and allowed it to run without informing Plaintiff of its existence;

e. The device recorded Plaintiff over the course of her entire rental—capturing her private behavior, her emotional state, and her communications.

1. Plaintiff had a reasonable and well-founded expectation of privacy inside a rented vehicle. A person using a vehicle for personal transportation has every right to expect that her private conversations and her private actions inside that vehicle will not be electronically recorded by a hidden device without her knowledge or consent.

2. Arevalo's secret recording of Plaintiff is an egregious intrusion upon her seclusion. The intrusion is rendered per se highly offensive by the fact that it violated federal law (the Federal Wiretap Act) and Washington law (RCW 9.73.030). Recording someone without consent in a private setting is not merely impolite or inconsiderate—it is criminal, which underscores its offensiveness and its violation of fundamental human dignity and autonomy.

3. Moreover, Arevalo's own conduct demonstrates that he knew Plaintiff was unaware of the recording and that he knew the recording was problematic. When Plaintiff called him after the accident, Arevalo immediately asked, "Did you have the dash cam plugged in?" This question reveals that Arevalo understood that Plaintiff might not have known about the camera—and that there was an expectation that she might, or should have been able to, unplug it. If Arevalo believed the camera's presence was known to Plaintiff and that she had consented to it, he would not have asked this question. His question demonstrates his consciousness of guilt and his awareness that he had violated her privacy.

4. Defendant Maricela Jimenez is liable for this intrusion under principles of vicarious liability and agency. As the owner of the vehicle that contained the recording device, and as the person who either listed it on Turo or authorized Arevalo to do so on her behalf, Jimenez is responsible for ensuring that renters were informed of and consented to any interior recording. By failing to disclose the camera or ensure its disclosure, Jimenez authorized or ratified Arevalo's intrusion.

5. As a direct and proximate result of this intentional intrusion upon her seclusion, Plaintiff suffered severe emotional distress, sense of violation, loss of privacy, psychological harm, and all other damages described in the factual allegations above. Plaintiff seeks all

damages allowable for this tort, including general damages for emotional distress, mental anguish, loss of privacy, and loss of control over her own image and identity.

**COUNT IV – PUBLIC DISCLOSURE OF PRIVATE FACTS**

**(Washington Common Law – Invasion of Privacy)**

**Against Defendants Jose Hernandez Arevalo, Atlanta Black Star, Inc., and Inside Edition, Inc.**

1. Plaintiff re-alleges and incorporates by reference all preceding paragraphs and allegations.

2. Washington law recognizes the tort of invasion of privacy in the form of "public disclosure of private facts." This tort prohibits the public disclosure of facts about a person's private life that are not matters of legitimate public concern and that would be highly offensive to a reasonable person to have disclosed.

3. Defendant Arevalo publicly disclosed private facts about Plaintiff without her consent. The facts disclosed include:

a. Visual and audio recordings of Plaintiff in a state of extreme emotional vulnerability and trauma, immediately after a frightening automobile accident;

b. Her panicked reactions and emotional distress, captured on video and broadcast to millions;

c. Her mistaken (though earnestly held) account of the accident, which she had been in the process of correcting;

d. Personal identifying information, including her face, her voice, her first name ("G.P."), her professional identity (identifiable as a nurse practitioner), and her workplace affiliation;

e. The accident incident itself, when contextualized with Plaintiff's identity, which was a private matter—a routine traffic accident that ordinarily would remain private between the parties involved, their insurers, and law enforcement.

1. These are undoubtedly private facts. They were not previously known to the public. Plaintiff had not voluntarily disclosed them. They concerned Plaintiff's private life—her

moment of maximum vulnerability after a traumatic event, her mistaken but sincere account of what had happened, her emotional and physical reaction to the crash.

2. Importantly, these facts were not matters of legitimate public concern. Plaintiff is not a public official. She is not a public figure. She did not voluntarily thrust herself into any public controversy. She was not engaged in any conduct that was a matter of public interest. A momentary lapse of judgment by an unknown nurse practitioner in a rural Washington accident—while regrettable—is not a matter of legitimate public interest. It is not comparable to reporting on governmental scandal, public corruption, or matters of genuine public safety importance. It is gossip and spectacle.

3. Indeed, the only reason this accident became a matter of public attention at all is because Defendant Arevalo deliberately published it to the world. The public had no independent knowledge of or interest in Ms. G.P.'s accident. Arevalo created the "public" interest by forcing her private moment into the public domain.

4. A reasonable person in Plaintiff's position would find the public disclosure of these private facts highly offensive and humiliating. Indeed, Plaintiff was mortified, devastated, and deeply traumatized. She experienced acute emotional distress, psychological harm, and the permanent loss of her privacy and her anonymity.

5. Defendant Arevalo had no legitimate or lawful justification for publishing this footage. He did not act in service of public safety or public information. He acted out of spite and a desire to punish and "expose" Ms. G.P.—his own words, "putting her on blast." His motivation was personal revenge, not public information.

6. Moreover, Arevalo's publication was compounded by the fact that the footage was itself illegally obtained. As established above, the recording of Plaintiff violated 18 U.S.C. § 2511 and RCW 9.73.030. Arevalo did not have a legal right to possess this footage. He certainly did not have a right to publish it. A person cannot use illegal conduct (secret recording) as a foundation for claiming a right to publicly disclose private facts. The illegality of the recording only heightens the offensiveness of the disclosure.

7. **Defendants Atlanta Black Star and Inside Edition** are liable for the same tort of public disclosure of private facts. By publishing articles and video segments about the incident, including Ms. G.P.'s photograph and identifying details, without her consent, these media defendants publicly disclosed private facts about a private citizen. The defendants knew or should have known that:

a. Ms. G.P. is a private individual, not a public figure;

b. The underlying incident was a private traffic accident, not a matter of legitimate public concern;

c. The original video was obtained illegally without Ms. G.P.'s consent;

d. Publishing her image and identifying details would further disseminate her identity and subject her to ongoing harassment;

e. Their publication was not necessary to report on any matter of genuine public interest.

1. These media defendants republished and amplified the false and invasive narrative without adding meaningful context or correcting the illegality of the underlying recording. They treated Ms. G.P.'s private misfortune as content to be sensationalized and monetized through ad revenue and viewership.

2. As a result of this public disclosure of private facts, Plaintiff suffered severe harm as described in the factual allegations—emotional distress, harassment, reputational injury, professional harm, and the permanent loss of her privacy. Plaintiff seeks compensatory damages for these injuries. Plaintiff also seeks **injunctive relief** ordering the removal of her identifying information and likeness from any publication remaining under Defendants' control, as damages alone cannot remedy the ongoing harm of having these private facts permanently available to millions of people worldwide.

## COUNT V – MISAPPROPRIATION OF NAME AND LIKENESS

**(Washington Right of Publicity – RCW 63.60; Common Law)**

**Against Defendants Jose Hernandez Arevalo, Atlanta Black Star, Inc., and Inside Edition, Inc.**

1.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs and allegations.

2.  Washington common law and Washington's Personality Rights Act, RCW 63.60.010 et seq., protect an individual's proprietary interest in her name, likeness, and persona. Every person has a fundamental right to control the use of her own identity and to prevent others from exploiting that identity for their own benefit without consent.

3.  Defendant Jose Hernandez Arevalo used Plaintiff's name, likeness (her image and voice), and identity for his own benefit without Plaintiff's consent. Specifically:

a. Arevalo published video footage displaying Plaintiff's face, unblurred and clearly identifiable;

b. Arevalo's publication captured Plaintiff's voice—her speaking, her panicked scream;

c. Arevalo's publication displayed Plaintiff's work identification badge, bearing her first name and workplace affiliation;

d. The context of the publication (description as a "nurse practitioner," reference to a Washington rental, specific details of the accident) made Plaintiff readily identifiable to anyone in her community;

e. Arevalo's publication included captions and narrative explicitly associating Plaintiff's identity with the video.

1.  Arevalo derived significant benefit from this use of Plaintiff's identity. The benefits included:

a. Personal gratification and the satisfaction of revenge;

b. Enhancement of his social media presence (views, likes, shares, follower growth);

c. Public attention and notoriety;

d. Potential commercial or monetization opportunities (if the post was linked to any revenue-sharing mechanisms or if it enhanced his profile's commercial value).

1.  Even absent direct financial gain, the use of Plaintiff's likeness to generate social media engagement, attention, and notoriety constitutes a "benefit" under Washington law. Gaining followers, engagement metrics, and public recognition is a form of value that qualifies as benefit under the right of publicity. Arevalo's deliberate use of her face and

identity to create viral, sensational content was precisely to generate attention and engagement—and he succeeded.

2. Plaintiff never consented to being filmed. Plaintiff never consented to the publication of her image. Plaintiff never consented to Arevalo's use of her face, voice, and identity to create viral content and gain social media attention.

3. Arevalo's use of Plaintiff's likeness was not privileged or excused. Arevalo was not a news organization reporting on a matter of public interest. He was not a government entity performing a public function. He was a private individual exploiting private footage he had unlawfully obtained, for personal revenge and aggrandizement.

4. **Defendants Atlanta Black Star and Inside Edition** similarly misappropriated Plaintiff's likeness. By publishing still images and video footage of Plaintiff's face without her consent, these media defendants used her likeness and image. The benefit to these defendants included:

a. Increased traffic to their websites and higher viewership of their television programs;

b. Enhanced engagement and click-through rates;

c. Advertising revenue generated by the increased traffic and attention;

d. Commercial benefit derived from using her image and story.

1. While these defendants might claim a "news reporting" exception, the use of Plaintiff's actual likeness was not necessary to report on distracted driving in general. These defendants could have reported on the incident without displaying her unblurred face, without publishing a still image from the video, or without providing identifying details that made clear who she was. The inclusion of her image and identifying details was a choice made to sensationalize the story, attract attention, and drive engagement—not to serve any pressing public interest.

2. As a result of this appropriation of her name and likeness, Plaintiff has been harmed by:

a. Loss of control over her own image and identity;

b. Emotional distress from seeing her face and identity exploited in mass media;

c. Injury to her dignity and reputation;

**ROSSI & CO. PC**
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

d. Violation of her proprietary interest in her own persona;

e. Ongoing harm as her image remains accessible and searchable online.

1. Plaintiff seeks damages for this misappropriation. Plaintiff also seeks **injunctive relief** preventing any further use of her likeness and requiring removal of her image from any platforms or publications under Defendants' control.

**COUNT VI – DEFAMATION AND FALSE LIGHT**

**(Washington Common Law)**

**Against Defendant Jose Hernandez Arevalo**

1. Plaintiff re-alleges and incorporates by reference all preceding paragraphs and allegations.

2. Defendant Arevalo published false and defamatory statements about Plaintiff, conveyed through both explicit written captions and the inflammatory framing and context of the video itself.

3. **The False Statements:** Specifically, Arevalo captioned his social media posts with statements including:

a. "My Turo renter told me someone ran her off the road... but look at this!" (implying she was lying or mistaken);

b. "She lied to my face when I had proof she was on her phone";

c. "Putting her on blast because she lied to my face."

1. **Falsity:** These captions convey explicitly that Plaintiff deliberately and dishonestly lied to Arevalo. The captions do not suggest that Plaintiff made an honest mistake. They do not convey that she was disoriented after a traumatic event. They explicitly accuse her of lying—of intentional deception.

2. This characterization is demonstrably false. Plaintiff did make a mistaken statement to Arevalo (and to law enforcement) about the cause of the accident. However, it was a mistake born of shock, disorientation, and psychological trauma—not a deliberate lie. Plaintiff was not trying to deceive Arevalo. She was genuinely confused in the aftermath

of a traumatic event. When her clarity returned over the next day or two, she recognized her error and was prepared to correct it.

3. Arevalo's explicit accusation that she "lied to [his] face" is a false statement of fact. It is not mere opinion or hyperbole. It is a factual assertion—that she intentionally deceived him—which is false.

4. **Injury to Reputation:** This false statement injures Plaintiff's reputation. It implies dishonesty, recklessness, disrespect for law and truth, and untrustworthiness. For a healthcare professional, these implications are particularly damaging. Patients rely on healthcare providers to be honest, truthful, competent, and trustworthy. An accusation of lying strikes at the heart of the professional trust relationship.

5. **Publication:** Arevalo published these false statements to millions of people worldwide on public social media platforms. The statements have been repeated in secondary publications, including by media outlets. The statements were made to a wide and open audience, causing harm to Plaintiff's reputation not just with strangers, but potentially with patients, colleagues, and others in her community.

6. **Fault:** Arevalo made these statements with knowledge of their falsity or with reckless indifference to the truth. Arevalo knew, from the context of his conversation with Plaintiff and from his understanding of her emotional state and disorientation immediately after the accident, that she was not intentionally deceiving him. Yet he chose to publicly characterize her as a liar anyway. He recklessly disregarded the distinction between an honest mistake and a deliberate lie. He deliberately chose language designed to convey moral blame and dishonesty.

7. **False Light:** Washington law also recognizes the related tort of "false light" invasion of privacy. Even if certain of Arevalo's statements do not rise to the level of defamation, the overall portrayal of Plaintiff in the video, captions, and narrative constitutes a false light. The overall effect of Arevalo's publication—showing her in a state of panic and vulnerability, accompanied by accusations that she lied—presents her to the public in a

way that a reasonable person would find offensive and misleading. She is presented as a liar and a reckless endangerer, when the truth is more nuanced and sympathetic.

8. As a proximate result of these false and defamatory statements, Plaintiff suffered harm to her reputation, emotional distress, professional consequences, and ongoing psychological damage as described in the factual allegations.

9. Plaintiff seeks damages for defamation and false light. Plaintiff also seeks **injunctive relief** requiring removal or correction of the false statements.

**COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Washington Common Law – "Outrage")**

**Against Defendant Jose Hernandez Arevalo**

1. Plaintiff re-alleges and incorporates by reference all preceding paragraphs and allegations.

2. Washington law recognizes the tort of intentional infliction of emotional distress (sometimes called "outrage"). This tort applies when:

a. A person engages in extreme and outrageous conduct;

b. That is intended to cause, or is done with reckless disregard as to whether it will cause, severe emotional distress;

c. To another person;

d. And severe emotional distress actually results.

1. Defendant Arevalo's conduct satisfies all elements of this tort. His conduct was extreme and outrageous—it exceeded all bounds of decency that society tolerates.

2. Arevalo secretly recorded a woman inside a private vehicle without her knowledge or consent. This alone constitutes a serious invasion of privacy. But he did not stop there. He then weaponized that illegal recording to publicly humiliate her. He deliberately edited the footage to emphasize her distress, her panic, her vulnerability. He accompanied it with inflammatory captions explicitly accusing her of lying and designed to invite public judgment and condemnation. He published it to platforms he knew would amplify

it virally. He did all of this knowing that she was a private individual who had not sought public attention. He did all of this knowing—or at minimum, with reckless disregard for—that his actions would cause her severe harm.

3. **Extremeness and Outrageousness:** The conduct was extreme. Arevalo did not merely record her. He did not merely post the video once and leave it alone. He edited it to maximize impact, captioned it with accusations, used hashtags to promote virality, and ensured maximum exposure. He weaponized an illegal recording for personal revenge. The manner, context, and deliberate amplification of the conduct demonstrate its extreme nature.

4. Washington courts have recognized that conduct involving deliberate humiliation and emotional targeting can meet the "extreme and outrageous" standard for IIED. Arevalo's conduct—secretly recording and then publicly humiliating a private woman for personal revenge, using inflammatory language designed to invite public contempt—meets this standard. It exceeds ordinary insults or hurt feelings. It is conduct that a reasonable person would regard as utterly intolerable.

5. **Intentionality or Recklessness:** The conduct was intentional or, at minimum, done with reckless indifference to the likelihood of severe emotional distress. Arevalo's own language demonstrates his intent. He wrote "putting her on blast"—acknowledging that his purpose was public humiliation. His decision to publish her face and identity alongside inflammatory accusations demonstrates his reckless indifference to the consequences. He knew, or certainly should have known, that publishing someone's face, voice, and identifying information alongside accusations of lying would cause severe emotional harm.

6. **Intimate Targeting:** The intimate nature of the recording (interior of a vehicle, private conversations) demonstrates the personal targeting of Arevalo's conduct. He was not making a generalized statement about distracted driving to educate the public. He was targeting Ms. G.P. specifically, for personal revenge. His post mentions her directly ("My Turo renter..."). He is not a stranger commenting on a public figure's behavior; he is a

person who had a direct relationship with Ms. G.P. and who used private information obtained during that relationship to humiliate her.

7. **Deliberate Amplification:** The deliberate amplification of the content through strategic use of hashtags and platform features, combined with his inflammatory captions, demonstrates an intent to maximize the harm to Plaintiff. He was not passively sharing a video; he was actively orchestrating her public humiliation. He deliberately chose language, hashtags, and platforms designed to achieve maximum viral spread.

8. **Severe Emotional Distress:** Severe emotional distress actually resulted. Plaintiff experienced acute anxiety, panic attacks, depression, insomnia, and intrusive thoughts. She experienced social isolation and withdrawal. She experienced professional harm and loss of relationships. She feared leaving her home. She increased her mental health treatment from monthly to twice-weekly sessions. These are not minor or modest emotional reactions; they are severe psychological harms that have persisted over months.

9. Plaintiff seeks all damages allowable for this tort, including general damages for severe emotional distress, mental anguish, loss of enjoyment of life, and psychological harm.


**COUNT VIII – NEGLIGENCE**

**Against Defendants Turo, Inc. and Maricela Jimenez**

1. Plaintiff re-alleges all preceding paragraphs, except any allegations of intentional conduct by these Defendants (as this count sounds in negligence only).

2. **Duty:** Defendant Turo and Defendant Jimenez owed Plaintiff, as a paying customer and user of their service, a legal duty to exercise reasonable care for her safety, privacy, and well-being during the course of the rental transaction. This duty arises from multiple sources:

a. **Business-Customer Relationship:** Turo explicitly invites consumers to entrust their personal use of vehicles to its platform. By holding itself out as a service provider for vehicle rentals, Turo undertakes an implicit duty to vet and regulate the vehicles and hosts on its platform for

known hazards and policy violations. A renter is a business invitee of Turo—someone invited onto Turo's system to complete a transaction. Turo owes such persons a duty of reasonable care.

b. **Turo's Undertakings and Explicit Policies:** Turo has explicitly established rules and policies governing the use of recording devices in vehicles. Turo's policy requires hosts to disclose any interior recording devices and to obtain affirmative consent from guests before activating such devices. By establishing and publicizing such a policy, Turo undertook a responsibility to enforce that policy in a reasonable manner. One who undertakes to provide protection must do so non-negligently. The law imposes a duty on those who, through their policies and practices, represent that certain protective measures are in place.

c. **Foreseeability of Harm:** It was entirely foreseeable to Turo that if a host were to record a guest without disclosure or consent, the guest's privacy would be violated and the guest could suffer severe emotional and reputational harm. Turo's own policy acknowledges this foreseeability—the very existence of a disclosure/consent policy demonstrates that Turo foresaw the privacy risks. Car-sharing platforms (Uber, Lyft, Turo) have experienced similar privacy breaches and recording scandals in recent years. The industry has grappled with the problem. Thus, Turo had clear notice of the foreseeability of this exact harm.

d. **Jimenez's Duty:** Ms. Jimenez, as the owner of the vehicle placed into commercial rental service, owed Plaintiff a duty to ensure that the vehicle did not pose a privacy or safety risk to renters. By allowing her vehicle to be listed on Turo with an undisclosed recording device, or by failing to ensure disclosure and consent, Jimenez breached a duty to protect renters' privacy.

1. **Breach:** Turo and Jimenez breached their duties of care in multiple and substantial respects:

a. **Failure to Enforce Disclosure and Consent Policy:** Despite having a clear, published policy requiring hosts to disclose interior cameras and obtain guest consent, Turo did not meaningfully enforce that policy. Turo's system did not require Arevalo to certify that he had disclosed the camera to the guest and obtained consent. Turo's system did not flag or alert the guest that the host had indicated a recording device. Turo did not require affirmative consent through its app or otherwise. Turo did not implement a mandatory disclosure flow. A reasonably careful company

would have implemented technical or procedural safeguards—for example, a mandatory in-app disclosure and consent workflow, a checkbox that the host must complete confirming disclosure was made, an automated warning displayed to guests if a host frequently uses dashcams, or at minimum an automated reminder to hosts about the disclosure requirement. Turo apparently implemented none of these.

b. **Negligent Host Oversight:** Turo failed to adequately monitor its hosts for compliance with important privacy policies. The dashcam in Arevalo's vehicle was installed in the vehicle; if Turo had conducted even minimal oversight—vehicle inspections, reviews of guest feedback for complaints about cameras, or spot checks—it might have discovered the undisclosed camera. Even if Turo never inspected the vehicle, a reasonably prudent company would have responded more vigorously when a guest (Ms. G.P.) reported a privacy breach. Turo's response was to remove the host; it did not investigate, did not attempt to contain the breach, and did not remedy the harm.

c. **Negligent Post-Incident Response:** Once Plaintiff reported the privacy breach to Turo on September 7, 2025, Turo had a duty to respond adequately and with appropriate urgency. Turo's response was minimal and sluggish. Turo did not immediately contact Arevalo and demand removal of all videos and images of Ms. G.P.. Turo did not offer meaningful support, resources, or compensation to Ms. G.P.. Turo did not assist with content removal from other platforms. Turo did not take steps to mitigate the ongoing harm. A reasonably prudent company, having identified that its own policy was violated and that a customer was being publicly humiliated and harassed as a result of the company's failure to enforce its own privacy protections, would have acted promptly to limit the damage. Instead, Turo treated the situation as if it were merely an internal host-management issue. They largely washed their hands of the matter.

d. **General Negligence:** In sum, Turo's entire conduct in relation to this rental—from failing to detect or prevent the unlawful recording to failing to intervene as Ms. G.P.'s situation metastasized into a global privacy violation and public humiliation—fell below the standard of care that a reasonably prudent company in its position would have exercised.

e. **Jimenez's Breach:** Jimenez allowed her vehicle to be rented out with an undisclosed camera, or at minimum failed to exercise reasonable supervision to ensure privacy policies were complied with. This constitutes breach of her duty to protect renters.

    1. **Causation:**

a. **But-For Causation:** But for Turo's negligence, Plaintiff would never have been subjected to unlawful recording. If Turo had meaningfully enforced its disclosure and consent requirement, one of two things would have happened: Either Arevalo would have disclosed the camera (and Plaintiff, being informed, would have declined the rental), or Arevalo would have been prohibited from using the camera or would have deactivated it. In either scenario, no recording of Plaintiff would exist. The entire cascade of harms—viral video, harassment, reputational injury, psychological trauma—would have been prevented.

b. **Proximate Causation:** Even if the accident itself had occurred (which is separate from the privacy issue), it would have remained a private matter handled between the parties and their insurers. The vast majority of traffic accidents do not become global spectacles. This one only became viral because of the illegal recording. The recording would not have existed but for Turo's failure to enforce its privacy policy. Thus, Turo's negligence was the proximate cause of the viral publication, the harassment, and the ongoing harm.

c. **Continuing Causation:** Even after the recording was made and the video was published, if Turo had responded swiftly and effectively (by immediately instructing Arevalo to remove the content and assisting Plaintiff with platform takedown requests), the breadth and duration of the harm might have been substantially mitigated. The critical first hours and days, when the video was spreading most rapidly, were a period in which Turo could have acted to contain the situation. Its failure to do so allowed the content to continue circulating unchecked, compounding the damage.

    1. **Damages:** Plaintiff has suffered the aforementioned damages (severe emotional distress, reputational injury, economic losses, loss of privacy, and ongoing psychological harm), all of which are recoverable in negligence. These are not "pure economic losses" in the sense that tort law sometimes refuses to protect against such losses. Rather, these are

personal injuries—emotional, reputational, and psychological harms stemming from invasion of privacy. Washington law permits recovery for such damages when they result from a breach of a legal duty owed by the defendant. Plaintiff also incurred economic damages: therapy costs, costs of changing her phone number and taking privacy protection measures, and lost income due to periods of disability and inability to work.

2. **No Comparative Fault:** Plaintiff's momentary distraction while driving—the cause of the accident itself—does not constitute comparative fault for the privacy violations and emotional harm that followed. Her driving error did not cause Arevalo to install a hidden camera. Her driving error did not cause Turo to fail to enforce its policies. Her driving error did not cause Arevalo to publish the illegal recording. The privacy violations and publication were independent acts of the Defendants, not caused by Plaintiff's conduct. To the extent that any court might find comparative fault, it would apply only to the accident itself, not to the privacy tort damages. The accident and the privacy invasion are legally distinct matters.

3. Plaintiff seeks all compensatory damages available for negligence, including:

a. Emotional distress;

b. Reputational harm;

c. Medical/therapy expenses;

d. Lost income;

e. Loss of privacy and control over her image;

f. All other actual harms flowing from Defendants' negligent conduct;

g. Pre-judgment interest on any special damages from the date of loss, and post-judgment interest as provided by Washington law.

## COUNT IX – VICARIOUS LIABILITY AND NEGLIGENT ENTRUSTMENT

**Against Defendant Maricela Jimenez (For Arevalo's Conduct)**

1. Plaintiff re-alleges and incorporates by reference all preceding paragraphs and allegations.

**ROSSI & CO. PC**
616 33ᴿᴰ AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

2.  Defendant Maricela Jimenez is vicariously liable for all of Defendant Arevalo's tortious conduct under principles of agency, respondeat superior, and joint enterprise.

3.  **Agency:** At all relevant times, Arevalo acted as Jimenez's agent or authorized representative in operating and managing the Turo rental. Jimenez is the registered owner of the vehicle. Arevalo listed the vehicle on Turo on her behalf or with her authorization. Arevalo managed the rental, interacted with guests, and shared in the profits from rental fees. The agency relationship is established.

4.  **Scope of Agency:** Arevalo's tortious conduct occurred within the scope of his agency. The installation and operation of the recording device was ostensibly for the purpose of protecting Jimenez's vehicle—which is within the scope of a host's duties under Turo. The fact that Arevalo used the recording device to harm Ms. G.P. does not take his conduct outside the scope of agency; rather, it is a tortious abuse of his agency authority. Under Washington law, a principal is liable for an agent's torts committed within the scope of the agency relationship.

5.  **Joint Enterprise:** Alternatively, Jimenez and Arevalo were engaged in a joint enterprise—a business arrangement to rent Jimenez's vehicle on Turo and share the benefits. In a joint enterprise, each participant is liable for the torts of the other if those torts are committed in furtherance of the enterprise. The recording and potential discovery of dangerous renter behavior (which Arevalo may have claimed as his rationale) was ostensibly related to managing and protecting the vehicle. The publication and harassment, however, exceeded any legitimate enterprise purpose. Nevertheless, Jimenez's failure to prevent or control Arevalo's conduct makes her liable as a joint venturer.

6.  **Negligent Entrustment (Direct Liability):** Independently of vicarious liability, Jimenez is directly liable to Plaintiff for negligent entrustment. Jimenez owned the vehicle and placed it into commercial rental through an arrangement with Arevalo. By doing so, she entrusted Arevalo with the means—the vehicle and the recording device—to invade Plaintiff's privacy. Jimenez either knew or should have known that Arevalo had installed

ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

an interior recording device. She failed to ensure that the device was disclosed to and consented to by renters. This failure constitutes negligent entrustment.

7. The foreseeable harm—invasion of a renter's privacy through secret recording—is exactly what occurred. Jimenez breached her duty to ensure that the vehicle did not pose a privacy risk to renters.

8. Plaintiff seeks all damages against Jimenez that are available against Arevalo under the various tort theories alleged in this Complaint, based on either vicarious liability or direct negligent entrustment liability.

## COUNT X – REQUEST FOR INJUNCTIVE RELIEF AGAINST PLATFORMS
**(Equitable Relief for Hosting and Amplifying Unlawfully Obtained Content)**
**Against Meta Platforms, Inc., Reddit, Inc., YouTube, LLC, and John Does 1-10**

1. Plaintiff re-alleges and incorporates by reference all preceding paragraphs and allegations.

2. Plaintiff does not seek monetary damages from these Defendants at this time, recognizing that federal law (47 U.S.C. § 230, the Communications Decency Act) may limit platform liability for content posted by users. However, Plaintiff seeks equitable relief in the form of preliminary and permanent injunctions requiring these Defendants to remove the unlawfully obtained content and prevent its re-publication.

3. The dashcam video published by Arevalo was obtained in violation of 18 U.S.C. § 2511 (the Federal Wiretap Act) and RCW 9.73.030 (Washington Privacy Act). The content itself is the product of criminal conduct.

4. These Defendants—Meta, Reddit, YouTube—operate vast platforms with millions of users and billions of pieces of content. These Defendants have the technical capability to identify, remove, and prevent re-posting of specific content. These Defendants have mechanisms for content moderation and removal.

5. These Defendants have actual knowledge that the content in question involves unlawfully obtained recordings. Plaintiff notified them; Ms. G.P. filed reports with the platforms.

Despite this knowledge, the Defendants have failed to remove the content or have been slow to do so.

6. The continued hosting and amplification of this unlawfully obtained content:

a. Perpetuates the violation of Plaintiff's privacy;

b. Enables ongoing harassment of Plaintiff;

c. Causes continuing emotional harm to Plaintiff;

d. Violates Washington and federal law by allowing the fruits of illegal wiretapping to remain in circulation;

e. Rewards Arevalo and other wrongdoers by allowing them to profit from illegal conduct.

1. **Equitable Relief is Appropriate:** Plaintiff requests that this Court issue preliminary and permanent injunctions ordering:

a. **Meta Platforms, Inc.:** Immediate removal of all copies of the dashcam video from Facebook and Instagram; de-indexing from recommendations and search; prohibition on algorithmic promotion; notification to Plaintiff when attempts are made to re-post the video; and such other relief as the Court deems just and proper.

b. **Reddit, Inc.:** Immediate removal of all threads and posts containing the dashcam video from r/WinStupidPrizes, r/Whatcouldgowrong, r/interestingasfuck, and all other subreddits; de-indexing from search; prohibition on re-posting; notification protocols; account suspension for users who engage in serial violations; and such other relief as the Court deems just and proper.

c. **YouTube, LLC:** Immediate removal of all copies of the video and derivative content; de-indexing; prevention of re-upload through account monitoring; notification protocols; and such other relief as the Court deems just and proper.

d. **John Does 1-10:** Once identified, permanent injunctions prohibiting further posting, sharing, or distribution of the unlawfully obtained content.

1. This relief is not unprecedented. Courts have issued injunctions against internet platforms requiring removal of unlawfully obtained content, especially where the content constitutes the fruits of federal crimes.

2. The balance of hardships strongly favors Plaintiff. The burden on the platforms of removing specific content is minimal; they remove content constantly pursuant to takedown requests and terms-of-service violations. The hardship to Plaintiff of continuing to have her illegal recording perpetually available to the world is severe and irreparable.

**COUNT XI – DEFAMATION AND FALSE LIGHT**

**(Against Media Defendants)**

**Against Atlanta Black Star, Inc. and Inside Edition, Inc.**

1. Plaintiff re-alleges and incorporates by reference all preceding paragraphs and allegations.

2. **Atlanta Black Star** and **Inside Edition** published articles and videos about the incident involving Ms. G.P. that contained false and misleading statements and presented her in a false and damaging light.

3. **False Statements:** Both outlets published and broadcast the false narrative that Ms. G.P. had lied about the cause of the accident. Atlanta Black Star's headline stated: "'She's Lucky She Could've Killed Someone!': Nurse Practitioner Exposed for Lying About Crash..." Inside Edition's segment described the incident with similar implications that she had lied or "tried to cover it up."

4. While Ms. G.P. did make a mistaken statement immediately after the accident (believing another vehicle had forced her off the road), this was an error caused by shock and disorientation, not a deliberate lie. The media defendants' portrayal of her as having "lied" conveys a false impression of intentional deception.

5. **False Light:** The overall presentation of Ms. G.P. by these defendants—shown in a state of panic and vulnerability, accompanied by accusations of dishonesty and recklessness— presents her in a false light. A reasonable person would regard the presentation as offensive and misleading.

6. **Injury:** These publications injured Ms. G.P.'s reputation by portraying her as dishonest, reckless, and untrustworthy.

7. **Fault:** The defendants published these statements with knowledge of their falsity or with reckless disregard for the truth. Both outlets had access to the same video evidence and could have recognized that the video showed an accident, not intentional misconduct or lying.

8. **Republication of Illegal Content:** Moreover, both defendants republished and further disseminated the illegally obtained video without acknowledging its illegal origins or the privacy violations involved. By treating the video as legitimate evidence to be broadcast and discussed, the defendants contributed to the false and misleading narrative.

9. As a result, Plaintiff suffered reputational harm, emotional distress, and ongoing damage as described in the factual allegations.

10. Plaintiff seeks damages for defamation and false light, as well as **injunctive relief** requiring removal or correction of false statements and removal of identifying images from the outlets' publications.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff G.P. respectfully prays that this Court enter judgment against Defendants, jointly and severally as appropriate, as follows:

### 1. AGAINST DEFENDANT JOSE HERNANDEZ AREVALO (SPECIFICALLY):

**a. Statutory Damages Under 18 U.S.C. § 2520 (Federal Wiretap Act):**

An award of statutory damages of **$10,000 per violation** (or $100 per day of violation, whichever is greater), or actual damages if greater;

**b. Statutory Damages Under RCW 9.73.060 (Washington Privacy Act):**

An award of liquidated damages of **$1,000 per violation** (or actual damages, whichever is greater);

**c. Punitive Damages:**

An award of punitive damages under 18 U.S.C. § 2520 and under Washington tort law, in an amount sufficient to punish and deter such egregious conduct;

**d. Compensatory Damages:**

An award of general and special compensatory damages in an amount to be proven at trial, but well in excess of **$500,000**, to compensate Plaintiff for:

i. Severe emotional distress, mental anguish, anxiety, depression, and psychological trauma;

ii. Loss of reputation and professional standing within her community;

iii. Actual economic losses, including therapy and mental health treatment costs, costs of privacy protection measures (phone number change, etc.), and lost wages during periods of incapacity;

iv. Loss of enjoyment of life, loss of sense of safety and privacy, social withdrawal, and isolation;

v. All other actual harms flowing from Defendants' conduct;

**e. Attorneys' Fees and Costs:**

An award of Plaintiff's reasonable and necessary attorneys' fees and costs incurred in prosecuting this action, as provided by 18 U.S.C. § 2520, RCW 9.73.060, and Washington common law;

**f. Pre-judgment and Post-judgment Interest:**

Interest on all damages as provided by Washington law and federal law, computed from the date of loss through the date of judgment and continuing thereafter;

**g. Permanent Injunctive Relief Against Arevalo:**

A permanent injunction prohibiting Defendant Arevalo and any persons in active concert or participation with him from:

i. Posting, publishing, sharing, or disseminating any footage, images, video files, or audio recordings of Ms. G.P. obtained from the August 25, 2025, incident or otherwise;

ii. Further disseminating the dashcam video or any derivative content containing Ms. G.P.'s image, voice, or identity;

iii. Using Ms. G.P.'s name, likeness, identifying information, or persona in any publication, post, comment, or communication;

iv. Providing the video, images, or recordings to any third party;

v. Re-engaging in similar conduct toward Ms. G.P. or any other person.

The injunction shall further require Defendant Arevalo to:

vi. Immediately remove any remaining posts, videos, or images containing Ms. G.P. under his control from all platforms;

vii. Provide all original recordings, memory cards, files, and copies thereof to Plaintiff's counsel for destruction.

**2. AGAINST DEFENDANTS MARICELA JIMENEZ AND TURO, INC.:**

**a. Compensatory Damages:**

An award of compensatory damages in an amount to be proven at trial, including:

i. Emotional distress and psychological harm;

ii. Reputational harm;

iii. Medical and therapy expenses;

iv. Lost income;

v. Loss of privacy and control over her image;

vi. All other actual harms flowing from their conduct;

**b. Attorneys' Fees:**

An award of reasonable attorneys' fees and costs, to the extent permitted by law;

**c. Pre-judgment and Post-judgment Interest:**

Interest as provided by law.

**3. AGAINST META PLATFORMS, INC., REDDIT, INC., YOUTUBE, LLC, AND JOHN DOES 1-10:**

**Preliminary and Permanent Injunctive Relief:**

a. **Against Meta:** An order requiring immediate removal of all copies of the dashcam video from Facebook and Instagram; de-indexing; prevention of re-posting; prohibition on algorithmic amplification; notification of re-posting attempts; and such other equitable relief as the Court deems just and proper;

b. **Against Reddit:** An order requiring immediate removal of all threads and posts containing the video; de-indexing; prevention of re-posting; account suspensions for serial violators; notification protocols; and such other relief as the Court deems just and proper;

c. **Against YouTube:** An order requiring immediate removal of all copies and derivatives; de-indexing; prevention of re-upload; notification protocols; and such other relief as the Court deems just and proper;

d. **Against John Does (Once Identified):** An order prohibiting further posting, sharing, or distribution of the unlawfully obtained content.

**4. AGAINST ATLANTA BLACK STAR, INC. AND INSIDE EDITION, INC.:**

**a. Compensatory Damages:**

An award of compensatory damages for defamation, false light, and misappropriation of likeness;

**b. Injunctive Relief:**

An order requiring removal or material redaction of the articles and videos, including removal or substantial blurring of Ms. G.P.'s identifying image, and retraction or correction of false statements;

**c. Attorneys' Fees:**

An award of reasonable attorneys' fees and costs;

**d. Interest:**

Pre-judgment and post-judgment interest as provided by law.

**5. DECLARATORY RELIEF:**

A declaration that:

a. Defendant Arevalo's conduct constitutes unlawful invasion of privacy, violation of 18 U.S.C. § 2511 (Federal Wiretap Act), violation of RCW 9.73.030 (Washington Privacy Act), misappropriation of likeness, defamation, false light, and intentional infliction of emotional distress;

b. Defendant Turo's conduct constitutes negligence in failing to protect Plaintiff from foreseeable privacy violations;

c. Defendant Jimenez's conduct constitutes negligent entrustment and vicarious liability for Arevalo's conduct;

d. The dashcam footage and any derivative content are unlawfully obtained and illegal under 18 U.S.C. § 2511 and RCW 9.73.030, and that such content is inadmissible in any legal proceeding pursuant to RCW 9.73.050.

**6. SUCH OTHER AND FURTHER RELIEF:**

As the Court deems just, proper, and equitable under the circumstances, including any additional relief warranted by evidence presented at trial or by changes in applicable law.

**7. DEMAND FOR JURY TRIAL:**

Plaintiff hereby demands a trial by jury on all issues of fact in this action, to the extent permitted by law.

**DATED: December 12, 2025**

**RESPECTFULLY SUBMITTED,**

        **ROSSI & CO., P.C.**

        By: _____
        **Ronald G. Rossi**
        WSBA No. 54720
        Admitted to Practice: 9th Circuit, U.S. District Court (W.D. Washington)
        616 33rd Ave NW
        Gig Harbor, WA 98335
        Telephone: (303) 222-0300
        Email: rgr@vihc.com

        *Counsel for Plaintiff G.P.*