THE HONORABLE Kymberly K. Evanson

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| G.P., an individual,<br><br>Plaintiff,<br><br>v.<br><br>JOSE HERNANDEZ AREVALO, an individual;<br><br>MARICELA JIMENEZ, an individual;<br><br>TURO, INC., a Delaware Corporation;<br><br>META PLATFORMS, INC., a Delaware Corporation;<br><br>REDDIT, INC., a Delaware Corporation;<br><br>YOUTUBE, LLC, a Delaware Limited Liability Company;<br><br>ATLANTA BLACK STAR, INC., a Georgia Corporation;<br><br>INSIDE EDITION, INC., a New York Corporation; and<br><br>JOHN DOES 1-10, individuals or entities unknown,<br><br>Defendants. | Case No.: **2:26-cv-00284-KKE**<br><br>**FIRST AMENDED COMPLAINT**<br>**FOR DAMAGES AND**<br>**INJUNCTIVE RELIEF**<br><br><br>*(Federal Wiretap Act Violations, 18 U.S.C. §§ 2511, 2520; Washington Privacy Act Violations, RCW 9.73.030; Intrusion Upon Seclusion; Public Disclosure of Private Facts; Misappropriation of Likeness; Defamation and False Light; Intentional Infliction of Emotional Distress; Negligence; Vicarious Liability; Negligent Entrustment; Unlawful Receipt and Distribution of Intercepted Communications Against Platform Defendants, 18 U.S.C. § 2511(1)(c)-(d); and Injunctive Relief)*<br><br>**JURY DEMAND** |

FIRST AMENDED COMPLAINT

**ROSSI & CO. PC**<br>616 33RD AVE NW | GIG HARBOR, WA 988335<br>303.222.0300 | RGR@VIHC.COM

1

*Plaintiff G.P. files this First Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B) as a matter of course, within 21 days of service of Defendant Meta Platforms, Inc.'s motion to dismiss filed May 6, 2026 (Dkt. 41). No prior amendment has been made. This First Amended Complaint supersedes the original Complaint (Dkt. 1) in its entirety.*

## I. INTRODUCTION

1. This is a case about the systematic violation of a woman's most fundamental right—the right to privacy—and the devastating cascade of consequences that followed when that violation was weaponized for revenge and amplified by internet platforms and media outlets to millions of people worldwide.

2. In August 2025, G.P., a 37-year-old private citizen, single mother of two children, and healthcare professional, rented a vehicle through Turo's car-sharing service. The vehicle's host, Defendant Jose Hernandez Arevalo, had installed an interior-facing dashcam in the vehicle. Prior to the trip, Arevalo sent a message through the Turo platform stating there was "a dashcam installed on the vehicle just for safety" and that Plaintiff was "more than welcome to unplug it" if she was not comfortable. That message did not disclose that the camera was interior-facing and directed at the driver, did not disclose that it would record Plaintiff's face, voice, expressions, and in-cabin behavior, and did not disclose that Arevalo would later review, extract, edit, and publicly disseminate the footage for personal purposes unrelated to any safety function. Plaintiff did not understand from Arevalo's message that she was consenting to interior surveillance of her person, and she did not knowingly or voluntarily consent to the recording of her private in-vehicle conduct or to any later use of such recordings beyond routine safety purposes.

3. When Ms. G.P. was involved in a single-vehicle accident that afternoon, she became the unwitting subject of what would become a global violation of her privacy, her dignity, and her right to control her own image and identity. Defendant Arevalo, acting with calculated malice and motivated by personal revenge, extracted the dashcam footage, edited it to be maximally

humiliating, and published it to social media with inflammatory captions designed to publicly shame and "blast" Ms. G.P.

4. What followed was a cataclysm: the video spread virally across Facebook, Instagram, Reddit, TikTok, YouTube, and other platforms. It was picked up by mainstream media outlets including Inside Edition and Atlanta Black Star. Millions of strangers worldwide saw Ms. G.P.'s face, heard her panicked voice, learned her identity, and were presented with a false and damaging narrative that she had lied and was reckless.

5. The consequences for Ms. G.P. have been profound and ongoing: severe emotional trauma, professional damage, public humiliation, social isolation, loss of her fundamental sense of safety and privacy, and the permanent commodification of her image and personal moment of vulnerability.

6. All of this was accomplished through conduct that violated federal law (the Federal Wiretap Act, 18 U.S.C. § 2511), Washington state law (RCW 9.73.030, the Washington Privacy Act), and the common law of privacy and tort. The platform and media defendants who received, hosted, amplified, and commercially exploited the footage are also liable under 18 U.S.C. §§ 2511(1)(c) and (d) for receiving and disclosing the contents of communications intercepted without adequate consent knowing or having reason to know of their unlawful origin.

7. This lawsuit seeks to hold all Defendants accountable for these violations, to recover compensatory and statutory damages, to obtain injunctive relief requiring removal of Ms. G.P.'s identifying information and image from internet platforms, and to send a clear message: in this country, a private person's right to privacy, dignity, and freedom from malicious harassment cannot be violated with impunity.

8. Plaintiff proceeds under the pseudonym "G.P." pursuant to the Court's Order provisionally granting her Motion to Proceed Under Pseudonym (Dkt. 11). Plaintiff's true legal name has been filed under seal.

FIRST AMENDED COMPLAINT

ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

## II. JURISDICTION AND VENUE

**A. Subject Matter Jurisdiction**

1. This Court has subject matter jurisdiction pursuant to: (a) 28 U.S.C. § 1332 (diversity—Plaintiff is a Washington citizen; Turo is incorporated in Delaware with principal offices in California; amount in controversy exceeds $75,000; complete diversity exists); (b) 28 U.S.C. § 1331 (federal question—claims arise under the Federal Wiretap Act, 18 U.S.C. § 2511 et seq., including § 2511(1)(a) against Arevalo and §§ 2511(1)(c) and (d) against all defendants who received or disclosed the intercepted communications); and (c) 28 U.S.C. § 1367 (supplemental jurisdiction over all state-law claims, which arise from the same common nucleus of operative fact).

**B. Personal Jurisdiction**

1. Defendant Jose Hernandez Arevalo is a resident of Snohomish County, Washington, who committed all tortious acts within this state. Personal jurisdiction exists under Fed. R. Civ. P. 4(k)(1)(A).

2. Defendant Maricela Jimenez is believed to reside in Washington State. She committed or authorized tortious acts in Washington as the registered vehicle owner. She is subject to personal jurisdiction in this Court.

3. Defendant Turo, Inc. has purposefully availed itself of the Washington market through continuous and systematic business operations, including facilitating thousands of rental transactions in Washington. The rental transaction at issue occurred entirely in Washington. Specific jurisdiction is established under *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980) *and Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985).

4. Defendant Meta Platforms, Inc. is subject to specific personal jurisdiction in this Court. Meta took affirmative, Washington-directed actions with respect to the content at issue. Meta's algorithm received an upload by a Washington resident, identified the video as depicting a Washington-based incident involving a Washington victim, and made autonomous decisions to amplify, distribute, and monetize that specific content to audiences in Washington. Meta's conduct—algorithmically selecting, promoting, and commercially monetizing a specific piece

of content depicting a specific Washington resident's private in-vehicle conduct—constitutes purposeful direction of conduct at the Washington forum that directly caused Plaintiff's injuries in Washington. See *Calder v. Jones,* 465 U.S. 783 (1984); *Mavrix Photo, Inc. v. Brand Techs., Inc.,* 647 F.3d 1218 (9th Cir. 2011). Plaintiff's claims against Meta arise directly from Meta's forum-directed algorithmic conduct, not merely from Meta's general presence in Washington.

5. Defendant Reddit, Inc. is subject to specific personal jurisdiction because Reddit's moderators and algorithmic systems affirmatively selected and promoted Washington-incident content in named subreddits to Washington users, and Reddit's Washington-based users participated in and amplified harassment directed at a Washington resident. These forum-directed activities directly gave rise to Plaintiff's claims.

6. Defendant YouTube, LLC is subject to specific personal jurisdiction because YouTube's Content ID and recommendation systems identified, promoted, and monetized uploads of the specific video depicting a Washington resident's private communications to Washington-based audiences. YouTube's forum-directed commercial conduct in connection with this specific content gives rise to the claims herein.

7. Defendants Atlanta Black Star, Inc. and Inside Edition, Inc. are subject to specific personal jurisdiction because each made an editorial decision to publish content about a specific Washington resident and Washington-based incident, knowing the content would be accessed in Washington and would cause injury to a Washington resident. *Calder v. Jones*, 465 U.S. 783 (1984).

8. John Doe Defendants 1-10: Upon identification through discovery, these defendants will be shown to have sufficient contacts with Washington to support personal jurisdiction.

**C. Venue**

1. Venue is proper in this District pursuant to 28 U.S.C. § 1391. The unlawful recording occurred on August 25, 2025, in Arlington, Snohomish County, Washington. Defendants Arevalo and Jimenez reside in Snohomish County. The initial publication occurred from this District. The primary injuries were suffered by Plaintiff in this District.

### III. PARTIES AND THEIR ROLES

**A. Plaintiff**

1. G.P. is a 37-year-old individual residing in Washington State. She is a private figure—a single mother of two children, ages 8 and 11—and a nurse practitioner. Prior to the events giving rise to this lawsuit, Ms. G.P. deliberately maintained a private personal life and a limited online presence. She had a reasonable and well-founded expectation of privacy in the interior of a rented vehicle.

**B. Defendant Jose Hernandez Arevalo**

1. Jose Hernandez Arevalo is an individual residing in Snohomish County, Washington. At all times relevant, Mr. Arevalo was the registered host of a vehicle made available for rental through Turo. He installed the interior-facing dashcam. After reviewing the dashcam footage following the accident, he made a deliberate and calculated decision to extract, edit, and publish that footage to social media with inflammatory captions designed to ridicule, humiliate, and falsely characterize Ms. G.P. as a liar. His actions were intentional, calculated, and motivated by personal revenge.

**C. Defendant Maricela Jimenez**

1. Maricela Jimenez is an individual believed to reside in Washington State. Ms. Jimenez is the registered owner of the 2013 Nissan Leaf rented to Ms. G.P. on August 25, 2025. Upon information and belief, Ms. Jimenez either personally listed the vehicle on Turo or knowingly permitted Jose Hernandez Arevalo to do so on her behalf, with her authorization and knowledge.

2. Plaintiff does not allege that Ms. Jimenez personally operated any recording device, reviewed any footage, or participated in the recording or publication of any content. Plaintiff's claims against Ms. Jimenez are limited to: (a) liability arising from her ownership of a vehicle placed into commercial rental service containing an undisclosed interior recording device; (b) vicarious liability for Mr. Arevalo's conduct as her authorized agent in managing and operating the Turo rental; and (c) negligent entrustment in permitting Arevalo to rent out her vehicle without taking

reasonable steps to ensure compliance with applicable privacy laws and Turo's platform policies.

3. At all relevant times, Mr. Arevalo acted as Ms. Jimenez's agent, representative, or authorized co-host in managing the Turo rental. Ms. Jimenez benefitted from the rental arrangement. A reasonable vehicle owner who permits another to rent her vehicle on a commercial platform would take steps to ensure that all platform policies—including policies requiring disclosure and consent for interior recording devices—were followed. Ms. Jimenez's failure to do so constitutes negligence and renders her vicariously liable for Arevalo's tortious conduct.

**D. Defendant Turo, Inc.**

1. Turo, Inc. ("Turo") is a Delaware corporation with its principal place of business in San Francisco, California. Turo operates a peer-to-peer vehicle-sharing platform, collects fees from every transaction, and exercises significant control over the terms and conditions governing transactions through its platform, Terms of Service, and policies.

2. Turo has published, and actively enforces in some contexts, a policy requiring all hosts to disclose any interior recording devices to guests and obtain affirmative consent before activating such devices. Despite having this policy, Turo failed to implement meaningful safeguards to ensure compliance. Turo's own Associate General Counsel acknowledged during a recorded call on March 9, 2026, that Arevalo was removed from Turo's platform as a result of his conduct with the camera and the subsequent dissemination of the recording—constituting Turo's own recognition that his acts were wrongful and outside the scope of any authorized platform use.

**E. Defendant Meta Platforms, Inc.**

1. Meta Platforms, Inc. ("Meta") is a Delaware corporation with its principal place of business in Menlo Park, California. Meta owns and operates Facebook and Instagram.

2. On or about August 30, 2025, Defendant Arevalo uploaded the dashcam video to Facebook as a public post and to Facebook's Reels feature. Meta's proprietary algorithms identified and actively amplified Mr. Arevalo's post, causing it to be reshared thousands of times and viewed by millions of people worldwide.

FIRST AMENDED COMPLAINT

ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

3. Meta is named not only for injunctive relief but because Meta received, used, and facilitated the disclosure of the contents of an illegally intercepted communication in violation of 18 U.S.C. §§ 2511(1)(c) and (d). Meta's commercial exploitation of the video—generating advertising revenue from engagement with content it knew or had reason to know was obtained without adequate consent—places Meta squarely within the scope of §§ 2511(1)(c) and (d).

**F. Defendant Reddit, Inc.**

1. Reddit, Inc. ("Reddit") is a Delaware corporation with its principal place of business in San Francisco, California. Reddit operates an online platform comprised of thousands of community forums (subreddits) and derives revenue from advertising and user engagement.

2. After Mr. Arevalo posted the video to Meta's platforms, users republished the video in multiple subreddits, including r/WinStupidPrizes, r/Whatcouldgowrong, and r/interestingasfuck. Reddit's moderators permitted and in some instances promoted the content, and Reddit's recommendation algorithms promoted these threads to millions of additional users.

3. Reddit is named not only for injunctive relief but because Reddit received, used, and facilitated the disclosure of the contents of an illegally intercepted communication in violation of 18 U.S.C. §§ 2511(1)(c) and (d). Reddit's active curation and promotion of the content—including placement into high-traffic communities and recommendation to millions of users—constitutes conduct beyond passive hosting and constitutes material contribution to development of unlawfully obtained content within the meaning of *Fair Housing Council v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008).

**G. Defendant YouTube, LLC**

1. YouTube, LLC is a Delaware limited liability company and wholly-owned subsidiary of Alphabet Inc. YouTube operates the world's largest video-sharing platform.

2. The dashcam video was uploaded to YouTube in multiple instances. YouTube's Content ID system and recommendation algorithms identified, promoted, and in some instances monetized the video and related derivative content, generating advertising revenue from engagement with unlawfully obtained private content.

FIRST AMENDED COMPLAINT

**ROSSI & CO. PC**
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

3. YouTube is named not only for injunctive relief but because it received, used, and facilitated the disclosure of the contents of an illegally intercepted communication in violation of 18 U.S.C. §§ 2511(1)(c) and (d). YouTube's active monetization of and algorithmic recommendation of the content constitute conduct beyond passive hosting within the meaning of *Roommates.com*, 521 F.3d 1157.

**H. Defendant Atlanta Black Star, Inc.**

1. Atlanta Black Star, Inc. is a news organization operating AtlantaBlackStar.com, organized under the laws of Georgia. Atlanta Black Star is a traditional media/editorial defendant—not a passive conduit—whose editorial staff made affirmative decisions to publish, headline, and illustrate their article using dashcam footage.

2. On or about September 2, 2025, Atlanta Black Star published a news article headlined: "'She's Lucky She Could've Killed Someone!': Nurse Practitioner Exposed for Lying About Crash After Viral Dashcam Shows What She Was Really Doing Behind the Wheel." The article included an unblurred still image of Ms. G.P.'s face extracted from the dashcam video. The article did not disclose that the underlying footage was obtained without Ms. G.P.'s informed consent and in potential violation of federal and Washington law.

3. Atlanta Black Star's editorial decision to publish and illustrate its article using dashcam footage without disclosure of its potentially illegal origins constitutes an independent act of publication. As a traditional media outlet exercising editorial control and judgment, Atlanta Black Star is not entitled to immunity under 47 U.S.C. § 230.

**I. Defendant Inside Edition, Inc.**

1. Inside Edition, Inc. is a television newsmagazine program that broadcasts nationally and posts content online. Inside Edition is a traditional broadcast/editorial media defendant whose producers and employees made affirmative editorial decisions to broadcast footage and publish content online.

2. On or about September 5, 2025, Inside Edition broadcast a nationally syndicated segment about the incident involving Ms. G.P., featuring footage from the dashcam video displaying Ms.

FIRST AMENDED COMPLAINT

**ROSSI & CO. PC**
616 33ʳᴰ AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

G.P.'s face and voice unobscured. The segment was also posted online on Inside Edition's website and YouTube channel.

3. Inside Edition's editorial decision to broadcast, narrate, and publish a segment using footage it knew or should have known was obtained in potential violation of federal and Washington privacy law constitutes an independent act of publication. Inside Edition is a traditional media defendant against whom Plaintiff asserts claims for defamation, false light, and public disclosure of private facts.

**J. John Doe Defendants 1-10**

1. Plaintiff names John Doe Defendants 1-10 to represent currently unidentified persons and entities who have participated in republishing, amplifying, or otherwise disseminating the unlawful content. These may include operators of viral video accounts (such as @dashcam.encounters), YouTube creators who made commentary or derivative content, Reddit users and moderators, and users of other platforms. Upon identification through discovery, Plaintiff will amend this Complaint to name them.

## IV. FACTUAL ALLEGATIONS

**A. The Rental and the Recording Device**

1. On August 23, 2025, Ms. G.P. used Turo's online platform to book a one-day rental of a 2013 Nissan Leaf electric vehicle listed by host Jose Hernandez Arevalo. The rental was confirmed for August 25, 2025, with pickup and return in Bothell, Washington.

2. During the online booking process, and prior to receiving a pre-trip message from Arevalo on the morning of August 25, 2025, neither Turo nor Defendant Arevalo informed Ms. G.P. through the standard booking flow that the vehicle contained any recording device. Turo's platform did not require Arevalo to certify or document pre-rental consent for any interior recording device.

3. Prior to Ms. G.P. picking up the vehicle, Defendant Arevalo sent her a message through Turo's platform stating, in relevant part, that "there is a dashcam installed on the vehicle just for safety" and that she was "more than welcome to unplug it if you aren't comfortable." Ms. G.P.,

FIRST AMENDED COMPLAINT

ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

who was in a hurry to get the vehicle and drive her children to school and get to work, received and read this message and replied, "Thank you."

4. Arevalo's message did not disclose that the dashcam was interior-facing and positioned to capture the driver's face, expressions, voice, and in-cabin conduct. It did not disclose that the device recorded audio as well as video of the vehicle's interior. It did not disclose that Arevalo would later retrieve, review, copy, and publicly disseminate the footage for purposes unrelated to any immediate safety function. The message described the device solely as a safety dashcam and made no mention of its direction, capability, or any intended non-safety use.

5. Ms. G.P. interpreted Arevalo's message as referring to a forward-facing or outward-pointing safety device of the kind commonly used to document road conditions and accidents—not as notice that she was consenting to be personally surveilled inside the vehicle. Ms. G.P. did not understand from Arevalo's message that an interior-facing camera was actively recording her face, voice, and in-cabin behavior. She did not knowingly or voluntarily consent to interior surveillance of her person or to any later use of such recordings beyond ordinary safety purposes. Turo's own Associate General Counsel acknowledged that the pre-trip message "didn't say the camera is pointed at the driver," confirming that the disclosure was not legally sufficient under Turo's own policies or applicable law.

6. Turo's published policies require that any host using a recording device with interior or audio capability must disclose the nature and direction of that device and obtain affirmative, written consent before activating it during a rental. Defendant Arevalo did not provide adequate disclosure of the interior-facing nature and audio capability of the device, and did not obtain the legally required informed consent. Turo failed to enforce its own policy and failed to implement safeguards to ensure compliance.

7. A reasonably diligent company that explicitly promulgates privacy policies would have implemented technical or procedural safeguards to ensure compliance—for example, requiring hosts to certify within the app that any interior camera had been disclosed and consented to. Turo did none of these things.

8. Ms. G.P. picked up the vehicle in Bothell on the morning of August 25, 2025, unaware that the dashcam was interior-facing and recording her face, voice, expressions, and private in-cabin behavior throughout the rental period.

**B. The Accident**

1. On the afternoon of August 25, 2025, Ms. G.P. was driving the Nissan Leaf in a rural area near Arlington, Snohomish County, Washington. She was unfamiliar with the vehicle and was rushing to return it by the agreed-upon time. While driving, she experienced a period of distraction. During that period of distraction—which the dashcam footage reflects lasted approximately twenty (20) seconds—Ms. G.P. looked down at her phone. Her attention lapsed from the road.

2. The vehicle drifted off the roadway. The Leaf struck a roadside mailbox and a shallow ditch. The airbag deployed. The vehicle sustained significant damage and became disabled. Ms. G.P. was physically shaken and scared. She suffered minor injuries—bruising from the airbag impact and a sprained wrist—but no serious or permanent physical harm.

3. Ms. G.P. experienced acute psychological shock and trauma. She was disoriented and confused. Her mind was flooded with adrenaline and fear. Due to a combination of shock, disorientation, and a previous traumatic automobile accident from months earlier that her mind briefly triggered, Ms. G.P. formed the mistaken belief that perhaps another vehicle had forced her off the road. This was an honest mistake resulting from acute traumatic stress, not an intentional lie.

4. Law enforcement deputies from the Snohomish County Sheriff's Office arrived at the scene. Ms. G.P., still emotionally distraught and disoriented, reported to the deputies that she believed another vehicle had been involved. This account was mistaken. No other vehicle was involved. Ms. G.P.'s distraction was solely responsible for the accident.

5. The sheriff's deputies took an incident report. No citations were issued against Ms. G.P. for distracted driving or any other violation. She was not charged and was not arrested.

**C. Immediately After the Accident: First Indication of the Camera's Existence**

1. Immediately after the accident, while still in a state of acute shock and trauma, Ms. G.P. called Defendant Arevalo to report the accident and that his vehicle was damaged.

2. During that call (at approximately 6:45 PM on August 25, 2025), Ms. G.P. described what she believed had happened—that she thought another vehicle had forced her off the road. She expressed deep remorse and apologized.

3. Arevalo asked Ms. G.P., "Did you have the dash cam plugged in?" Ms. G.P. was surprised by this question. Having limited familiarity with dashcam technology, and having received a pre-trip message describing the device only as a safety dashcam, Ms. G.P. did not understand from Arevalo's question that the device was interior-facing and had been capturing her face, voice, and in-cabin conduct throughout the rental period. She did not understand that she had been the subject of interior electronic surveillance.

4. Arevalo then said, in substance, "If you didn't unplug it, it's probably all on video." Ms. G.P., still in shock, responded hopefully that perhaps the camera had recorded evidence of the other car she mistakenly believed had been involved.

5. The call ended with Ms. G.P. expressing remorse and stating she would handle the situation through insurance. Arevalo did not indicate anger or give any hint of his intention to use the footage to humiliate her.

**D. Arevalo Accesses and Reviews the Recording**

1. Over the days following the accident, Defendant Arevalo retrieved the damaged vehicle from impound or otherwise accessed the memory card or storage device from the dashcam. He reviewed the recordings in their entirety.

2. The footage clearly showed what had actually occurred: Ms. G.P. had been looking at her phone in the moments before the crash; no other vehicle was visible; her distraction alone caused her to lose control; the accident was a single-vehicle incident of her own making.

3. This discovery appears to have enraged Defendant Arevalo. Ms. G.P.'s initial account had been wrong. His vehicle was totaled. Rather than handling the matter through Turo's claims process, insurance channels, or direct conversation with Ms. G.P., Arevalo made a deliberate, calculated decision to punish her publicly. He decided to "put her on blast," in his own words.

FIRST AMENDED COMPLAINT

4. Arevalo was not motivated by any legitimate public interest. He was not attempting to educate the public about distracted driving in any neutral way. His motivation was personal revenge. He decided to weaponize the footage to humiliate and publicly shame Ms. G.P.

**E. The Recording: Federal and Washington Law Violations**

1. Before detailing the publication and viral spread, it is critical to establish that Arevalo's recording of Ms. G.P.'s private in-cabin communications without legally adequate disclosure or consent constituted criminal and civil violations of federal and Washington law.

2. Under 18 U.S.C. § 2511, the Federal Wiretap Act makes it unlawful for any person to intentionally intercept any oral communication by means of any electronic device without the consent of all parties.

3. Ms. G.P.'s voice, her private utterances, and her phone conversations inside the vehicle constitute "oral communications." They occurred in the interior of a rental vehicle, a setting where Ms. G.P. had a reasonable expectation of privacy. Defendant Arevalo recorded these communications using an electronic device—the interior-facing dashcam—without Ms. G.P.'s informed consent to interior surveillance.

4. Under RCW 9.73.030, Washington's Privacy Act, it is unlawful to record any private oral communication without first obtaining the consent of all persons engaged in the communication. Washington is an all-party consent state. Even if Arevalo were a party to a telephone conversation with Ms. G.P., he could not lawfully record it without her consent; and for her private utterances to which he was not a party, the requirement is even clearer.

5. Arevalo's recording violated both statutes. While Arevalo provided a pre-trip message referencing a safety dashcam, that message did not constitute adequate disclosure or informed consent to interior surveillance. Turo's own Associate General Counsel acknowledged that the message "didn't say the camera is pointed at the driver," confirming that the disclosure was legally insufficient. Adequate consent under Washington's all-party consent statute requires at minimum that the other party know what is being recorded and affirmatively agree to it.

6. No applicable exception applies. This was not authorized law enforcement recording. This was not an emergency circumstance. This was a routine private context in which Arevalo had

no authority to record Ms. G.P.'s interior conduct and communications without her full informed consent.

**F. Publication to Meta's Platforms: The Viral Spread Begins**

1. On or about August 30, 2025, approximately five days after the accident, Defendant Arevalo edited the dashcam footage into a short video compilation and published it to social media. He posted it to Facebook under his personal profile as a "public" video and also shared it to Facebook's Reels feature, designed for maximum visibility and rapid distribution.

2. The video contained both the forward-facing dashcam footage and the interior-facing footage clearly showing Ms. G.P., her face unblurred and unmistakable, her expressions, her distress, and her voice as she screamed in panic when the vehicle impacted the mailbox and ditch. The interior footage also captured her work identification badge bearing her first name and identifying her workplace.

3. In the caption, Arevalo wrote a deliberately inflammatory and accusatory message, including in substance: "This is what happens when you TEXT AND DRIVE. My Turo renter told me someone ran her off the road... but look at this!"; and "Putting her on blast because she lied to my face when I had proof she was on her phone." Arevalo added hashtags including #distracteddriving, #dashcam, and #instantkarma—designed to maximize visibility and algorithmic promotion.

4. This caption explicitly accused Ms. G.P. of lying. It framed her initial account as a deliberate deception—a lie told "to [Arevalo's] face." It was designed to invite moral judgment, condemnation, and public shaming.

5. Because Facebook and Instagram are integrated, the video became simultaneously viewable on Instagram. Within hours, Meta's proprietary algorithms identified and amplified Arevalo's post. The video was reshared thousands of times and viewed by millions. The Reels version garnered millions of views within days. Millions of strangers worldwide saw Ms. G.P.'s face, heard her voice, and were presented with Arevalo's false characterization that she had lied.

**G. Spread to Reddit and Other Platforms**

1. Within days of Arevalo's publication to Meta's platforms, users on Reddit republished the video in r/WinStupidPrizes with the title "Top notch moron texting and driving." That thread gained enormous traction, amassing hundreds of cruel and mocking comments and millions of views.

2. Threads appeared in r/WinStupidPrizes, r/interestingasfuck, and other subreddits. Commenters discussed that the person was a Washington nurse practitioner and that she had "lied about another car." Some noted they recognized her face or badge.

3. An Instagram account, @dashcam.encounters, reposted the video with a caption admonishing distracted driving and added millions of additional views. The video appeared on TikTok in multiple forms, receiving hundreds of thousands of likes.

**H. Publication by Mainstream Media Outlets**

1. By early September 2025, the story had been picked up by mainstream news outlets, further amplifying the harm and broadening the exposure of Ms. G.P.'s identity to new audiences.

2. Atlanta Black Star: On or about September 2, 2025, Atlanta Black Star published an online news article headlined: "'She's Lucky She Could've Killed Someone!': Nurse Practitioner Exposed for Lying About Crash After Viral Dashcam Shows What She Was Really Doing Behind the Wheel." The article narrated the incident in detail, described Ms. G.P. as a "Washington nurse practitioner" who crashed while texting and "falsely blamed a phantom driver," quoted Arevalo's inflammatory captions directly, and included an unblurred still image of Ms. G.P.'s face extracted from the dashcam video. Although Atlanta Black Star did not publish Ms. G.P.'s full legal last name, the combination of her photograph, first name, profession, specific location, and accident details made her readily identifiable to anyone in her professional community or personal circles. The article did not disclose that the underlying footage may have been obtained in violation of federal and Washington privacy law.

3. Inside Edition: On or about September 5, 2025, Inside Edition broadcast a nationally syndicated television segment about the incident and posted it online on Inside Edition's website and YouTube channel. The segment featured clips from the dashcam video displaying Ms.

FIRST AMENDED COMPLAINT

ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

G.P.'s face unblurred and her voice clearly audible. The segment's narrator described "a woman caught on camera texting and driving before crashing a rental car" and noted that "the owner says he's taking legal action because the woman tried to cover it up by claiming someone ran her off the road." The segment was framed as a cautionary tale about distracted driving but presented Ms. G.P. in a negative, condemning light and contributed to the widespread recognition and identification of her image and story.

4. Neither media outlet disclosed that the underlying dashcam footage was obtained without Ms. G.P.'s informed consent to interior surveillance and in potential violation of applicable law. Neither acknowledged Arevalo's subsequent removal from Turo's platform.

**I. The Critical Missing Element: No Acknowledgment of the Privacy Violation**

1. Nowhere in any of the news reports, Reddit discussions, or social media posts was there any acknowledgment of the critical fact: the video was obtained without Ms. G.P.'s informed consent to interior surveillance, in potential violation of federal and Washington law.

2. Nowhere did any outlet note that the person who obtained and published the video had violated applicable privacy laws by recording Ms. G.P.'s private in-cabin communications without legally adequate disclosure or consent.

3. Instead, the narrative presented to the public was simple and sensational: a nurse practitioner had been "caught red-handed" texting and driving, had lied about it, and deserved to be publicly exposed and shamed. The privacy violation that made the exposure possible was never disclosed.

4. This omission allowed Arevalo to be perceived as a truth-teller rather than a person who violated applicable privacy laws. It allowed the media outlets to present themselves as exposing dangerous behavior rather than as participants in privacy violations. And it allowed the public to engage in mob harassment of Ms. G.P. without understanding that the entire premise rested on surveillance footage obtained without legally adequate consent.

FIRST AMENDED COMPLAINT

ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

17

**J. Identification, Doxing, and Harassment**

1. Although Arevalo did not publish Ms. G.P.'s full legal last name in his initial social media post, the video itself effectively identified her to anyone in her personal, professional, or social circles, and even to determined internet users capable of assembling clues.

2. In the interior video, Ms. G.P. is clearly visible wearing her work badge on a lanyard. The badge displays her first name. Secondary posts and comments explicitly identified her as a nurse practitioner in Washington State. These details, combined, were more than sufficient to identify her to anyone in her community.

3. Within a day or two of the video's initial publication, Ms. G.P.'s personal Facebook and Instagram accounts were discovered and targeted by online trolls and harassers. These accounts were bombarded with hateful messages and comments from strangers worldwide.

4. The harassment was vicious, dehumanizing, and relentless. It included accusations she was a disgrace to nurses; wishes that CPS would take her children; misogynistic stereotypes; comments threatening her safety and her children's safety; and explicit, sexually threatening and demeaning comments.

**K. The Profound and Ongoing Devastation to Ms. G.P.**

1. On August 31, 2025, Ms. G.P. received a text message from a friend: "Were you in a car accident a couple days ago? Because I think I saw a video of you on Reddit..." Ms. G.P. searched for the video and found it. She saw her own face, unmistakable. She heard her own voice screaming in panic. She was devastated, mortified, and felt profoundly violated.

**Harassment and Violation:**

2. Ms. G.P.'s personal social media accounts were flooded with hateful messages. People dug through her social media to find photos of her children and posted cruel comments targeting her parenting and her children's safety. Someone located an old LinkedIn profile and began messaging people in her professional network. Feeling overwhelmed, Ms. G.P. shut down all of her social media accounts by September 3, 2025, and changed her personal cell phone number after receiving multiple calls from strangers who had used internet sleuthing to locate her contact information.

**Professional Humiliation:**

3. At her workplace, the effect was immediate and chilling. Colleagues whispered about the video. Patients who had viewed the viral video canceled appointments. One patient joked, "You won't text and drive on the way to my home visit, right?" The comment confirmed that Ms. G.P., a healthcare professional who had spent years building trust with patients, was now known to them as "that nurse who crashed her car while texting and lied about it."

**Reputational Injury:**

4. Ms. G.P.'s professional reputation in her community took a significant and lasting hit. Patients entrust healthcare providers with their health and medical vulnerabilities. That relationship depends entirely on the patient's confidence in the provider's judgment, competence, honesty, and reliability. Many in Ms. G.P.'s local community now know her through the distorted lens of the viral video—as a woman who was caught texting and driving, who lied about it, and who is irresponsible and untrustworthy. It is an unfair and fundamentally false characterization that she did not create, did not invite, and had no ability to control.

**Psychological and Emotional Trauma:**

5. The mental and emotional toll on Ms. G.P. has been severe and ongoing. She experienced acute anxiety, panic attacks, depression, insomnia, and intrusive thoughts. She developed a profound fear of being recognized in public. She accelerated her mental health treatment from monthly to twice-weekly sessions, addressing both the acute trauma of the public humiliation and pre-existing trauma from a previous automobile accident that the current incident reactivated.

6. For a period of time after the incident, Ms. G.P. could not bring herself to drive at all—not solely because of the crash, but because of fear that people on the road might recognize her. On one occasion at a gas station, a stranger recognized her and asked aloud, "Hey, are you that lady from the texting video?" She felt that her anonymity had been permanently stripped away.

**Loss of Basic Freedoms and Control Over Her Image:**

7. Ms. G.P. lives in a state of ongoing fear and dread. The video still circulates in certain corners of the internet. Every time it resurfaces, Ms. G.P. experiences a resurgence of acute trauma. She

lives in constant dread that new people in her life—new neighbors, new patients, PTA parents at her children's school, potential employers—will discover the video and connect it to her.

8. Ms. G.P.'s greatest and most ongoing injury is the permanent loss of control over her own image and identity. Her face, her voice, and her identifying information have been placed into the public domain without her informed consent. That footage persists online indefinitely. It is searchable and shareable. She cannot erase it. She cannot restore the privacy she once had.

**L. The Statutory Basis for Privacy Protection**

1. The Federal Wiretap Act (18 U.S.C. § 2511 et seq.) was enacted to protect Americans from unlawful electronic surveillance of their private communications. The statute provides for civil liability including statutory damages of $100 per day of violation or $10,000 per violation, whichever is greater, plus punitive damages and attorneys' fees.

2. Washington State enacted RCW 9.73.030 in recognition of a fundamental truth: people have a constitutional and legal right to expect that their private conversations will not be recorded without their knowledge and full informed consent. The statute provides for statutory damages of not less than $1,000 per violation, plus attorneys' fees and costs.

3. Defendant Arevalo violated both statutes. He recorded Ms. G.P.'s voice and private communications inside a vehicle without legally adequate disclosure or informed consent. He then used the fruits of that recording to humiliate her and to subject her to the kind of public pillorying these statutes were designed to prevent.

**V. CAUSES OF ACTION**

**COUNT I — VIOLATION OF FEDERAL WIRETAP ACT**

*(18 U.S.C. §§ 2511(1)(a) and 2520)*

*Against Defendant Jose Hernandez Arevalo*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

2. Defendant Arevalo violated 18 U.S.C. § 2511(1)(a) by intentionally intercepting Ms. G.P.'s private oral communications by means of the interior-facing dashcam—an electronic device—

without Ms. G.P.'s informed consent to interior surveillance and without any applicable statutory exception.

3. The recording captured: (a) Ms. G.P.'s private phone conversations during the rental period; (b) her private utterances and exclamations inside the vehicle; and (c) all audio communications within the vehicle's interior during the rental. These are "oral communications" within the meaning of the statute.

4. All elements of a § 2511 violation are satisfied: Arevalo acted intentionally; the pre-trip message did not constitute informed consent to interior surveillance; the recording occurred in a private setting; and no statutory exception applies.

5. Under 18 U.S.C. § 2520, Plaintiff seeks statutory damages of not less than $10,000 per violation (or $100 per day, whichever is greater), actual damages if greater, punitive damages, and attorneys' fees and costs.

## COUNT II — VIOLATION OF WASHINGTON PRIVACY ACT

*(RCW 9.73.030 and RCW 9.73.060)*

*Against Defendant Jose Hernandez Arevalo*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

2. Defendant Arevalo violated RCW 9.73.030 by intentionally recording Ms. G.P.'s private oral communications without her informed all-party consent as required by Washington's Privacy Act.

3. Washington is an all-party consent state. Arevalo could not lawfully record Ms. G.P.'s phone calls or private utterances without her consent—even as a participant in a call. For her private utterances to which Arevalo was not a party, the requirement is even more absolute.

4. The pre-trip message describing the device as a safety dashcam did not constitute legally adequate disclosure or all-party consent under RCW 9.73.030. Adequate consent requires at minimum that Ms. G.P. have known that an interior-facing device was recording her face, voice, and in-cabin conduct, and have affirmatively agreed to it.

5. Under RCW 9.73.050, any recording made in violation of RCW 9.73.030 is inadmissible in any civil or criminal proceeding.

6. Plaintiff seeks statutory damages of not less than $1,000 per violation under RCW 9.73.060, plus actual damages, punitive damages, and attorneys' fees and costs.

## COUNT III — INTRUSION UPON SECLUSION

*(Washington Common Law)*

*Against Defendants Jose Hernandez Arevalo and Turo, Inc.*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

2. Washington law recognizes the tort of intrusion upon seclusion, protecting a person's right to be free from unwanted and highly offensive intrusion into her private affairs.

3. Defendant Arevalo intentionally and knowingly intruded upon the solitude and seclusion of Plaintiff in a highly offensive manner: (a) without Plaintiff's informed consent, Arevalo installed and maintained an interior-facing recording device in the rental vehicle; (b) the device was positioned to record the vehicle's interior, including the driver's seat, driver's face, and all in-cabin audio; (c) the device captured Plaintiff's voice, private utterances, conversations, and in-cabin conduct; and (d) Arevalo activated this device without adequately disclosing its interior-facing nature or audio capability to Plaintiff.

4. The intrusion is highly offensive to a reasonable person. Recording someone inside a private vehicle without adequate disclosure of the interior-facing nature of the device—and subsequently using that recording to publicly humiliate the person—is conduct no reasonable person would regard as acceptable.

5. Defendant Turo is additionally liable for intrusion upon seclusion as a result of its failure to enforce its own disclosure policies and its failure to implement safeguards that would have prevented the intrusion. Turo's removal of Arevalo from the platform confirms his conduct was outside the bounds of permissible platform use.

6. As a direct and proximate result of this intrusion, Plaintiff suffered severe emotional distress, reputational harm, loss of privacy, and all other damages described herein.

## COUNT IV — PUBLIC DISCLOSURE OF PRIVATE FACTS

*(Washington Common Law)*

*Against Defendants Jose Hernandez Arevalo, Atlanta Black Star, Inc., and Inside Edition, Inc.*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

2. Washington law recognizes the tort of public disclosure of private facts, which applies when: (a) a defendant publicly discloses facts about the plaintiff; (b) the facts are private; (c) the disclosure would be highly offensive to a reasonable person; and (d) the disclosure serves no legitimate public interest that required exposing Plaintiff by name and face.

3. Defendant Arevalo publicly disclosed private facts about Plaintiff by publishing interior dashcam footage—capturing her face, voice, emotional state, expressions, and private in-cabin conduct—to millions of people on public social media platforms, accompanied by inflammatory captions accusing her of lying.

4. The disclosed facts are private. The interior of a rental vehicle is a private space. Plaintiff had no reason to believe her in-cabin behavior and emotional state were being captured for public distribution. Her in-vehicle conduct, voice, and private moments are not matters she placed in the public domain.

5. The disclosure is highly offensive to a reasonable person. Ms. G.P.'s private moment of vulnerability—her panic, her distress, her private conduct—was broadcast to millions, accompanied by accusations she was a liar.

6. The disclosure served no legitimate public interest that required the exposure of Ms. G.P.'s identity and private conduct. While distracted driving is a matter of public concern, that concern did not require Arevalo to expose a private person's face, identity, and private conduct to public shaming and harassment. The disclosure was motivated by personal revenge.

7. Defendants Atlanta Black Star and Inside Edition republished and further disseminated these private facts to national audiences, compounding the invasion and broadening the exposure of Ms. G.P.'s identity.

8. As a direct and proximate result, Plaintiff suffered reputational harm, emotional distress, professional consequences, and all other damages described herein.

### COUNT V — MISAPPROPRIATION OF LIKENESS

*(Washington Common Law)*

*Against Defendants Jose Hernandez Arevalo, Atlanta Black Star, Inc., and Inside Edition, Inc.*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

2. Washington law recognizes the tort of misappropriation of likeness, which protects a person's right to control the commercial and other use of her name, face, voice, and identity.

3. Defendant Arevalo appropriated Ms. G.P.'s likeness—her face, voice, and identity—without her consent for his own benefit. He edited and published footage to generate social media attention, notoriety, engagement, and personal satisfaction. The use of her face, voice, and identity to create viral, sensational content was precisely to generate attention and engagement—and he succeeded.

4. Plaintiff never consented to being filmed in an interior-facing manner. Plaintiff never consented to the publication of her image. Plaintiff never consented to Arevalo's use of her face, voice, and identity to create viral content.

5. Arevalo was not a news organization reporting on a matter of public interest. He was a private individual exploiting footage obtained without adequate consent, for personal revenge and aggrandizement.

6. Defendants Atlanta Black Star and Inside Edition similarly misappropriated Plaintiff's likeness by publishing still images and video footage of Plaintiff's face without her consent. These defendants could have reported on distracted driving without displaying her unblurred face, publishing a still image from the video, or providing identifying details that made clear who she was. The inclusion of her image and identifying details was a choice made to sensationalize the story and drive engagement.

7. As a result of this misappropriation, Plaintiff has been harmed by: (a) loss of control over her own image and identity; (b) emotional distress from seeing her face and identity exploited in

mass media; (c) injury to her dignity and reputation; (d) violation of her proprietary interest in her own persona; and (e) ongoing harm as her image remains accessible and searchable online.

8. Plaintiff seeks damages for this misappropriation and injunctive relief preventing any further use of her likeness and requiring removal of her image from any platforms or publications under Defendants' control.

## COUNT VI — DEFAMATION AND FALSE LIGHT

*(Washington Common Law)*

*Against Defendant Jose Hernandez Arevalo*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

2. Defendant Arevalo published false and defamatory statements about Plaintiff, conveyed through both explicit written captions and the inflammatory framing and context of the video itself.

3. The False Statements: Specifically, Arevalo captioned his social media posts with statements including: (a) "My Turo renter told me someone ran her off the road... but look at this!" (implying she was lying); (b) "She lied to my face when I had proof she was on her phone"; and (c) "Putting her on blast because she lied to my face."

4. Falsity: These captions explicitly convey that Plaintiff deliberately and dishonestly lied to Arevalo. The captions do not suggest that Plaintiff made an honest mistake. They explicitly accuse her of intentional deception. This characterization is demonstrably false. Plaintiff's mistaken statement was born of shock, disorientation, and psychological trauma—not a deliberate lie. Arevalo's explicit accusation that she "lied to his face" is a false statement of fact, not mere opinion or hyperbole.

5. Injury to Reputation: This false statement injures Plaintiff's reputation by implying dishonesty, recklessness, and untrustworthiness. For a healthcare professional, these implications are particularly damaging, as patients rely on healthcare providers to be honest, truthful, competent, and trustworthy.

6. Publication: Arevalo published these false statements to millions of people worldwide on public social media platforms. The statements have been repeated in secondary publications, including by media outlets.

7. Fault: Arevalo made these statements with knowledge of their falsity or with reckless indifference to the truth. Arevalo knew, from the context of his conversation with Plaintiff, that she was genuinely confused and disoriented immediately after the accident. He chose to publicly characterize her as a liar anyway, recklessly disregarding the distinction between an honest mistake and a deliberate lie.

8. False Light: Washington law also recognizes the related tort of "false light" invasion of privacy. The overall portrayal of Plaintiff—shown in a state of panic and vulnerability, accompanied by accusations that she lied—presents her to the public in a way a reasonable person would find offensive and misleading.

9. As a proximate result, Plaintiff suffered harm to her reputation, emotional distress, professional consequences, and ongoing psychological damage as described herein.

10. Plaintiff seeks damages for defamation and false light, and injunctive relief requiring removal or correction of the false statements.

## COUNT VII — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(Washington Common Law — "Outrage")*

*Against Defendant Jose Hernandez Arevalo*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

2. Washington law recognizes the tort of intentional infliction of emotional distress (sometimes called "outrage"). This tort applies when: (a) a person engages in extreme and outrageous conduct; (b) that is intended to cause, or is done with reckless disregard as to whether it will cause, severe emotional distress; (c) to another person; and (d) severe emotional distress actually results.

3. Defendant Arevalo's conduct satisfies all elements. He secretly recorded a woman inside a private vehicle without her informed consent, then weaponized that footage to publicly

humiliate her. He deliberately edited the footage to emphasize her distress, her panic, her vulnerability. He accompanied it with inflammatory captions explicitly accusing her of lying, designed to invite public judgment and condemnation. He published it to platforms he knew would amplify it virally. He did all of this knowing she was a private individual who had not sought public attention.

4. Extremeness and Outrageousness: The conduct was extreme. Arevalo did not merely record her. He edited the footage to maximize impact, captioned it with false accusations, used hashtags to promote virality, and ensured maximum exposure. He weaponized a recording obtained without adequate consent for personal revenge. Washington courts have recognized that conduct involving deliberate humiliation and emotional targeting can meet the "extreme and outrageous" standard for IIED. Arevalo's conduct—publicly humiliating a private woman for personal revenge using inflammatory language designed to invite public contempt—meets this standard.

5. Intentionality or Recklessness: The conduct was intentional or, at minimum, done with reckless indifference to the likelihood of severe emotional distress. Arevalo's own language demonstrates his intent: he wrote "putting her on blast"—acknowledging that his purpose was public humiliation. He knew, or certainly should have known, that publishing someone's face, voice, and identifying information alongside accusations of lying would cause severe emotional harm.

6. Severe Emotional Distress: Severe emotional distress actually resulted. Plaintiff experienced acute anxiety, panic attacks, depression, insomnia, and intrusive thoughts. She experienced social isolation and professional harm. She feared leaving her home. She increased her mental health treatment from monthly to twice-weekly sessions. These are not minor emotional reactions; they are severe psychological harms that have persisted over months.

7. Plaintiff seeks all damages allowable for this tort, including general damages for severe emotional distress, mental anguish, loss of enjoyment of life, and psychological harm.

FIRST AMENDED COMPLAINT

ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

27

## COUNT VIII — NEGLIGENCE

*Against Defendants Turo, Inc. and Maricela Jimenez*

1. Plaintiff re-alleges all preceding paragraphs, except any allegations of intentional conduct by these Defendants.

2. Duty: Defendant Turo and Defendant Jimenez owed Plaintiff, as a paying customer and user of their service, a legal duty to exercise reasonable care for her privacy, safety, and well-being during the course of the rental transaction. This duty arises from: (a) Turo's business-customer relationship with Plaintiff; (b) Turo's explicit promulgation of policies requiring disclosure and consent for interior recording devices, which Turo undertook and failed to enforce; (c) Ms. Jimenez's status as registered owner of the vehicle placed into commercial service; and (d) the foreseeability that an undisclosed interior recording device in a rental vehicle could cause serious harm to a renter.

3. Breach: Turo breached its duty by failing to implement safeguards to ensure compliance with its interior recording device policies. Turo's platform allowed Arevalo to list the vehicle, accept bookings, and complete the rental transaction without verification that the device had been adequately disclosed and consented to. Jimenez breached her duty by permitting Arevalo to rent out her vehicle without taking steps to ensure compliance with applicable privacy laws and platform policies.

4. Causation: These breaches were the proximate cause of Plaintiff's injuries. Had Turo and Jimenez fulfilled their respective duties, Plaintiff would either have been adequately informed and consented, or no recording would have been obtained.

5. Damages: As a direct and proximate result of these breaches, Plaintiff suffered severe emotional distress, reputational harm, loss of privacy, professional damage, and all other damages described herein.

## COUNT IX — VICARIOUS LIABILITY

*Against Defendants Turo, Inc. and Maricela Jimenez*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

FIRST AMENDED COMPLAINT

2. At all times relevant to this Complaint, Defendant Arevalo acted as the agent, authorized representative, and co-host of Defendant Jimenez in managing, marketing, and operating the Turo rental of her vehicle. Jimenez authorized Arevalo to rent out her vehicle and to manage all aspects of the rental, including interactions with renters.

3. Jimenez is vicariously liable for Arevalo's tortious conduct because he acted as her agent with her actual and apparent authority in managing and operating the rental, and the tortious conduct occurred in the course of and in connection with the performance of that agency.

4. Defendant Turo is also liable under principles of apparent authority and respondeat superior to the extent that Turo held out Arevalo as a vetted host on its platform, exercised control or the right to control over the terms governing his conduct, and enabled and benefitted from the rental transaction in which the tortious conduct occurred.

5. As a direct and proximate result of the conduct of Arevalo—for which Turo and Jimenez are vicariously liable—Plaintiff suffered all damages described herein.

## COUNT X — NEGLIGENT ENTRUSTMENT

*Against Defendant Maricela Jimenez*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

2. Defendant Jimenez, as the registered owner of the 2013 Nissan Leaf, entrusted that vehicle to Defendant Arevalo for use as a commercial rental vehicle on Turo's platform.

3. Defendant Jimenez knew or should have known that the vehicle contained an interior-facing recording device and that Arevalo, as the person managing and operating the rental, would be interacting with and potentially recording renters.

4. A reasonable vehicle owner who permits another person to rent out her vehicle on a commercial platform under her authority would exercise reasonable care to ensure that the vehicle complied with all applicable privacy laws and platform policies—including policies requiring adequate disclosure and consent for interior recording devices.

FIRST AMENDED COMPLAINT

ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

29

5. Defendant Jimenez failed to exercise this reasonable care. She entrusted the vehicle to Arevalo and permitted the rental of her vehicle to proceed without taking steps to ensure compliance with applicable privacy requirements.

6. As a direct and proximate result, Plaintiff suffered all injuries described herein.

## COUNT XI — UNLAWFUL RECEIPT AND DISTRIBUTION OF INTERCEPTED COMMUNICATIONS

*(18 U.S.C. §§ 2511(1)(c) and 2511(1)(d))*

*Against Defendants Meta Platforms, Inc., Reddit, Inc., and YouTube, LLC*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

2. 18 U.S.C. § 2511(1)(c) makes it unlawful for any person to intentionally disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

3. 18 U.S.C. § 2511(1)(d) makes it unlawful for any person to intentionally use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through unlawful interception.

4. Meta Platforms, Inc.: Meta's own automated systems are designed to flag content posted with certain hashtags (e.g., #dashcam) that may involve third parties recorded without consent — Meta thus had reason to know. Meta received the video uploaded by Arevalo—a Washington resident who installed an interior-facing dashcam in a rental vehicle without adequate disclosure or consent. Meta knew or had reason to know that the video contained interior footage of a person recorded without her informed consent. The pre-trip message sent through Turo's platform and the nature of the footage (showing an interior-facing recording of a renter) provided Meta with a factual basis to know or have reason to know of its potentially unlawful origin. Meta intentionally disclosed and used the contents of that recording by algorithmically amplifying, distributing, and monetizing it, generating advertising revenue from engagement with the unlawfully obtained footage.

5. Reddit, Inc.: Reddit received, hosted, and disclosed the contents of the unlawfully obtained recording. Reddit's moderators permitted and in some instances promoted threads containing the video. Reddit knew or had reason to know of the video's potentially unlawful origins based on the nature and content of the footage. Reddit intentionally used and disclosed the contents of the recording through its active curation, promotion, and recommendation of the content to millions of users.

6. YouTube, LLC: YouTube received, hosted, and disclosed the contents of the unlawfully obtained recording through its Content ID system and recommendation algorithms. YouTube knew or had reason to know of the potentially unlawful origins of the footage based on its nature and content. YouTube intentionally used and disclosed the contents of the recording through its active promotion and monetization of the content.

7. Each platform defendant's active commercial exploitation of the unlawfully obtained footage—including algorithmic promotion and advertising monetization—constitutes conduct beyond passive hosting and establishes liability under 18 U.S.C. §§ 2511(1)(c) and (d).

8. Plaintiff seeks all relief available under 18 U.S.C. § 2520 against each platform defendant, including statutory damages of not less than $10,000 per violation (or $100 per day, whichever is greater), actual damages if greater, punitive damages, and attorneys' fees and costs. Plaintiff also seeks injunctive relief.

## COUNT XII — DEFAMATION AND FALSE LIGHT AGAINST MEDIA DEFENDANTS

*(Washington Common Law)*

*Against Defendants Atlanta Black Star, Inc. and Inside Edition, Inc.*

1. Plaintiff re-alleges and incorporates all preceding paragraphs.

2. Atlanta Black Star and Inside Edition published articles and broadcasts about the incident involving Ms. G.P. that contained false and misleading statements and presented her in a false and damaging light.

FIRST AMENDED COMPLAINT

ROSSI & CO. PC
616 33ʳᴰ AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

3. False Statements: Both outlets published and broadcast the false narrative that Ms. G.P. had lied about the cause of the accident. Atlanta Black Star's headline stated: "'She's Lucky She Could've Killed Someone!': Nurse Practitioner Exposed for Lying About Crash." Inside Edition's segment similarly implied that she had lied and "tried to cover it up."

4. While Ms. G.P. did make a mistaken statement immediately after the accident, this was an error caused by shock and disorientation—not a deliberate lie. The media defendants' portrayal of her as having "lied" conveys a false impression of intentional deception.

5. False Light: The overall presentation of Ms. G.P. by these defendants—shown in a state of panic and vulnerability, accompanied by accusations of dishonesty and recklessness—presents her in a false light a reasonable person would regard as offensive and misleading.

6. Injury: These publications injured Ms. G.P.'s reputation by portraying her as dishonest, reckless, and untrustworthy.

7. Fault: The defendants published these statements with knowledge of their falsity or with reckless disregard for the truth. Both outlets had access to the same video evidence and could have recognized that the video showed an accident, not intentional misconduct or deliberate lying.

8. Republication of Potentially Illegal Content: Moreover, both defendants republished and further disseminated the footage without acknowledging its potentially illegal origins or the privacy violations involved, contributing to the false and misleading narrative.

9. As a result, Plaintiff suffered reputational harm, emotional distress, and ongoing damage as described in the factual allegations. Plaintiff seeks damages and injunctive relief requiring removal or correction of false statements and removal of identifying images from the outlets' publications.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff G.P. respectfully prays that this Court enter judgment against Defendants, jointly and severally as appropriate, as follows:

FIRST AMENDED COMPLAINT

ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

32

**1.  AGAINST DEFENDANT JOSE HERNANDEZ AREVALO:**

a. Statutory damages under 18 U.S.C. § 2520 of $10,000 per violation (or $100 per day, whichever is greater), or actual damages if greater;

b. Statutory damages under RCW 9.73.060 of $1,000 per violation (or actual damages, whichever is greater);

c. Punitive damages in an amount to be determined at trial;

d. Damages for defamation and false light;

e. Damages for intentional infliction of emotional distress;

f. Damages for intrusion upon seclusion;

g. Damages for public disclosure of private facts;

h. Damages for misappropriation of likeness;

i. A permanent injunction requiring removal of all copies of the video and derivative content from any platform, website, or digital medium under Arevalo's control and prohibiting any further publication of Ms. G.P.'s image, voice, or identifying information without her consent;

j. Attorneys' fees and costs as provided by statute and law;


**2.  AGAINST DEFENDANT MARICELA JIMENEZ:**

a. Compensatory damages for negligence, negligent entrustment, and vicarious liability;

b. Such other relief as this Court deems just and proper;


**3.  AGAINST DEFENDANT TURO, INC.:**

a. Compensatory damages for negligence, intrusion upon seclusion, and vicarious liability;

b. Injunctive relief requiring Turo to implement mandatory safeguards for disclosure and consent verification for interior recording devices on its platform;

c. Such other relief as this Court deems just and proper;

FIRST AMENDED COMPLAINT

**ROSSI & CO. PC**
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

**4.   AGAINST DEFENDANT META PLATFORMS, INC.:**

a. Statutory damages under 18 U.S.C. § 2520 of $10,000 per violation (or $100 per day, whichever is greater), or actual damages if greater;

b. Punitive damages;

c. A preliminary and permanent injunction ordering: immediate removal of all copies of the dashcam video from Facebook and Instagram; de-indexing from recommendations and search; prohibition on algorithmic promotion of the content; notification to Plaintiff when attempts are made to re-post the video; and such other relief as the Court deems just and proper;

d. Attorneys' fees and costs;

**5.   AGAINST DEFENDANT REDDIT, INC.:**

a. Statutory damages under 18 U.S.C. § 2520 of $10,000 per violation (or $100 per day, whichever is greater), or actual damages if greater;

b. Punitive damages;

c. A preliminary and permanent injunction ordering: immediate removal of all threads and posts containing the dashcam video from r/WinStupidPrizes, r/Whatcouldgowrong, r/interestingasfuck, and all other subreddits; de-indexing from search; prohibition on re-posting; notification protocols; and such other relief as the Court deems just and proper;

d. Attorneys' fees and costs;

**6.   AGAINST DEFENDANT YOUTUBE, LLC:**

a. Statutory damages under 18 U.S.C. § 2520 of $10,000 per violation (or $100 per day, whichever is greater), or actual damages if greater;

b. Punitive damages;

c. A preliminary and permanent injunction ordering: immediate removal of all copies of the video and derivative content; de-indexing; prevention of re-upload; notification protocols; and such other relief as the Court deems just and proper;

d. Attorneys' fees and costs;

FIRST AMENDED COMPLAINT

ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 988335
303.222.0300 | RGR@VIHC.COM

34

**7.  AGAINST DEFENDANTS ATLANTA BLACK STAR, INC. AND INSIDE EDITION, INC.:**

a. Compensatory damages for defamation, false light, and public disclosure of private facts;

b. Punitive damages;

c. A permanent injunction requiring removal or correction of false statements and removal of identifying images from their respective publications;

d. Attorneys' fees and costs;

**8.  AGAINST ALL DEFENDANTS:**

a. Pre-judgment and post-judgment interest at the applicable rate;

b. Such other and further relief as the Court deems just, proper, and equitable;

## VII. DEMAND FOR JURY TRIAL

Plaintiff G.P. hereby demands a trial by jury on all issues so triable.


Respectfully submitted,


Dated: May 19, 2026


**ROSSI & CO., P.C.**


s/ Ronald G. Rossi_____
Ronald G. Rossi
WSBA 54720
Admitted 9th Cir. U.S. Dist. WD WA
616 33rd AVE NW
Gig Harbor, WA 98335
Tel: 303-222-0300
Email: rgr@vihc.com